## · JESSE A. REAMS v. STATE.

No. A-2282.   Opinion Filed May 13, 1916.

(157 Pac. 273.)

1.   **APPEAL—Review—Prejudice From Error.**   When evidence is introduced on behalf of the state against a defendant whether by improper cross-examination of the person charged, or other persons called as witnesses by him, or by direct examination of state's own witnesses, which is reasonably calculated to arouse the passions of the jury against the defendant, and prevent him from having a fair and impartial trial, a conviction resulting under such conditions will be reversed unless it is made clearly to appear that no injury could have resulted or did result to the accused.

2.   **HOMICIDE—Evidence—Admissibility.**   For testimony improperly admitted by the trial court over objections of plaintiff in error, see opinion.

3.   **HOMICIDE—Evidence—Admissibility.**   Upon the trial of a person charged with murder proof of the relationship existing between such person and his spouse is, as a general rule, inadmissible.

4.   **FORMER DECISION DISTINGUISHED.**   The doctrine in the case of Caples v. State, 3 Okla. Cr. 72, 104 Pac. 403, 26 L. R. A. (N. S.) 1103, reviewed and distinguished from the rule declared in the case at bar.

5.   **FORMER DECISION DISTINGUISHED.**   The doctrine in the case of Goben v. State, 7 Okla. Cr. 190, 126 Pac. 198, reviewed and distinguished from the rule declared in the case at bar.

6.   **TRIAL—Conduct in General.**   The principal purpose of a criminal trial is to mete out justice and punish the guilty. The trial of one who is guilty must be conducted under such rules as would protect the innocent under like circumstances.

*Appeal from District Court, Lincoln County;*
*Hon. Chas. B. Wilson, Judge.*

Jesse Reams was convicted of manslaughter, and appeals. Reversed.

*F. A. Rittenhouse* and *Hoffman & Foster,* for plaintiff in error.

*R. McMillan,* Asst. Atty. Gen., and *Streeter Speakman,* for defendant in error.

ARMSTRONG, J. Plaintiff in error, Jesse A. Reams, was convicted of manslaughter at the December, 1913, term of the District Court of Lincoln county and his punishment fixed at 15 years in the state penitentiary.

The information charges the plaintiff in error with the murder of Sam Huggins on the 19th day of June, 1913.

The proof on behalf of the state tends to show that the homicide occurred near Pleasant Grove school house in Lincoln county on the date alleged. Plaintiff in error lived at Sparks, about 7 miles away; that he had separated from his wife, who lived with her parents a short distance southeast of said school house; that plaintiff in error had filed a petition for divorce some time previous to the homicide.

Sam Huggins, the deceased, was a single man, and lived about a mile and a half from the home of the parents of Mrs. Reams.

The night of the homicide the plaintiff in error went to the neighborhood school house armed with a revolver. It seems that religious services of some character were being held at the school house. Shortly after he arrived there the deceased, Huggins, and Mrs. Reams, came in together. As soon as the services were completed the plaintiff in error spoke to his wife and told her that he wanted to take her home; that he had come to ask her to go back home and live with him, and he took hold of her but she pulled away from him, seized the arm of Huggins, and started out of the house. Plaintiff in error put his hands in his pockets and was admonished by an acquaintance to have no trouble on account of others being endangered. When Huggins and Mrs. Reams went out of the house Huggins turned around, and in an offensive threatening manner admonished the plaintiff in error not to follow him down the road, but plaintiff in error got on his horse and followed any way. A short distance from the school house, probably a quarter of a mile, he overtook his wife and Huggins. Three shots were heard in succession. A number of

people went down to the scene and found Huggins dying in the road. The plaintiff in error and his wife were standing some distance away together.

At the scene of the homicide plaintiff in error made some statement that he had seen the county attorney and certain prominent attorneys of Chandler and that there would be nothing done with him. He was taken in charge by some one present and delivered to the sheriff in Chandler.

The proof on behalf of the plaintiff in error corroborates the main facts offered by the state. In addition, plaintiff in error offers proof by himself and his witnesses that he shot the deceased in his necessary self-defense.

The deceased was apparently armed with a slung-shot. One was found under his body as he lay on the ground immediately after the shooting. The plaintiff in error says: "That when he rode up to the deceased and his wife, deceased made an effort to injure him; and, as he thought, to shoot him, and he shot in his own necessary defense.

In addition, it was shown that the plaintiff in error had warned deceased to stay away from his wife and discontinue keeping company with her. Also that he had been endeavoring to effect a reconciliation with his wife and had offered to take her back and support her and their child. Two letters were taken from the body of deceased, and offered in evidence, one of which was addressed to him and the other addressed to Mrs. Reams. The letters are as follows:

"Sparks, Okla. 5-8-1913.

Mr. Sam Huggins.

Dear Sir:

I hereby notify you to stay away from my wife as you have been keeping company with her regular for some time. This is all the warning you will get. If you have any excuse write me tomorrow. You are persuading her to do things that she would not do if you would let her alone and so hoping you will not cause any more trouble. Sam if you dont want any body to

know about this letter keep your mouth shut and stay away from her and wont anybody know anything about it. If you are not careful you will keep on till you let that bunch get you into serious trouble.

Yours very respectfully,

J. A. Reams."

"Sparks, Okla. 6/17

My dearest Darling little Wife and Baby Boy.

How are you and how is little Clifford hope he is well by this time. Darling the time is growing short only a few days yet, Honey till we will be separated forever and oh Honey are you going to let it be that way. I am still willing to withdraw that suit and take you and Clifford back and Honey I will acknowledge Clifford as my Baby, yes Kid he is my own Darling little Boy and Darling I am not afraid to claim you and him for my own and forever I am willing to trust you. I know Honey you have done a good many things wrong but Darling I know I was the cause. If I had of treated you wright you would not have done it and Darling are you going to give up your home and all your money you have got here to run around to dances for a little while so Darling in the name of God please stop that and come on home and go to living right for Honey it may not be long till you will Die and then we would be separated forever and Honey you will go somewhere and I fear Sweet Heart it will be to the Bad World for you know you are not doing right. I was with another girl Saturday night Sunday and Sunday night but Darling my heart and love was with you and Clifford. Lucy I am not mad at your papa, tell him I am not for I could get mad at my father as soon. Now Sweet Hart please do come home today. Honey I don't feel like God would ever forgive me for the way I have treated you if I don't take you back. While I have said I would not many times but I have changed Kid in every way and Honey you see everything different and Darling I have got plenty to make you happy now. Lucy I got my salary raised again back eleven hundred dollars so you see I have got the shortest route and the least mail to handle and the same salary, now I will get back pay from the first of January. Darling read this letter to your papa and mama. I know Honey they are keeping you away from me if they would not persuade you not to come you would be with me a long time ago now Darling please come home and lets be happy for Darling life is too short for us to go through unhappy and Darling I don't want to have anything to do with any other

girl for I wouldn't be satisfied, and I feel ashamed when I am with another girl so please make up your mind to come home and settle down and do right. Please ans and come home so I will close for this time. Answer soon. Good by my Darling little Wife and Baby boy.

Love and kisses.

Jesse."

The plaintiff in error testified that he was fond of his wife and desired to have her live with him, and went to the school house, not for the purpose of seeking trouble, but for the purpose of endeavoring to persuade her to return home with him, and that he killed the deceased in his necessary self-defense.

There were no eye witnesses to the shooting who testified at the trial except plaintiff in error.

On re-buttal the state offered in evidence the divorce petition which had been filed by the plaintiff in error against his wife, which is as follows, omitting formal parts:

"That he is now and has been for more than one year last past and next preceding the filing of this petition an actual resident in good faith of Lincoln County, State of Oklahoma.

That plaintiff and defendant were married at Chandler, Lincoln County, State of Oklahoma, on the 6th day of March, 1909.

That at the time of plaintiff's marriage with defendant without the knowledge of this plaintiff the defendant was pregnant by another than this plaintiff, her husband.

Wherefore plaintiff asks for a decree of absolute divorce from the defendant.

Hoffman & Foster,<br>Attorneys for Plaintiff."

Further the state introduced testimony tending to establish the fact that plaintiff in error was guilty of improper proposals to a married woman named Carnes, and a married woman by the name of Paul. In this connection the record discloses the following proceedings:

"Q. State your name? A. Paul is my name.

"Q. . Just talk loud? A. Francis Paul is my name.

"Q. Where do you live, Mrs. Paul? A. Sparks.

"Q. You know the defendant in this case, Jesse A. Reams? A. I am personally acquainted with him.

"Q. Do you remember the homicide wherein Sam Huggins lost his life that occurred the 19th day of June? A. No sir, I do not.

"Q. I say do you remember hearing of when that occurred? A. Yes, sir.

"Q. I will ask you if previous to that two or three or four weeks you had a conversation with the defendant at your house, your home?

"Mr. Foster: Objected to as incompetent, irrelevant and immaterial, tending to prove no issue in this case, an attempt to impeach the defendant on immaterial matter.

"The Court: Overruled, answer yes or no. A. Yes, I did.

"Q. State what the defendant said there at that time.

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial, tending to prove no issue in this case.

"Q. State what he did.

"Mr. Foster: Wait.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"A. I don't understand the question.

"Q. You had a conversation with the defendant?

"Mr. Foster: Let her answer the question.

"The Court: Read the question.

"Q. State what he did? A. What he did?

"Q. Yes, what the defendant did and said there at that time?

Mr. Foster: Object to question as reason before, incompetent, irrelevant and immaterial, tending to impeach on collateral matter.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"A. Do you mean a conversation about this same case?

"Q. No. A. He came to the house and asked me for his laundry, I was doing his washing at the time and he asked me for the washing and I gave it to him and he asked me what the price was and I said fifty cents and he paid me.

"Mr. Foster: Objected to as incompetent, irrelevant and immaterial, move to strike it out and the jury instructed not to regard it.

"The Court: That part is immaterial and is withdrawn from your consideration.

"Q. Go ahead. A. He says to me, 'Can't you make a living easier than washing?' and I says, 'Not that anybody knows of' and—

"Mr. Foster: Objected to as incompetent, irrelevant and immaterial.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"A. And he says, 'I will give you a dollar if you will go in the other room and satisfy me for a little while' and I says, 'No, sir, you leave this house in a hurry.' He was carrying mail. That is all.

"Mr. Foster: Move to strike out this testimony as incompetent, irrelevant and immaterial, tending to prove no issue in this case.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"Q. After this, after the homicide, did you have a conversation with the defendant about this matter?

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial, not an impeaching question and cannot be proven, part of his case in chief.

"The Court: Objection sustained.

"Mr. Speakman: The Court won't hold I can't corroborate this testimony.

"The Court: I don't think that is corroborative, if one statement is true, probably the other statement is true."

"Q. State your name. A. Emma Carnes.

"Q. Where do you live, Mrs. Carnes? A. Sparks.

"Q. Are you a married woman? A. Yes sir.

"Q. Married at this time? A. Sir?

"Q. Are you married at this time? A. Yes sir.

"Q. Were you married in June of this year? A. No, I was married two years ago last January.

"Q. You was a married woman in that month, wasn't you, in June this year? A. Yes sir.

"Q. Do you know the time on the 19th of June, of the homicide of Sam Huggins, do you remember that time? A. I guess so.

"Q. State if previous to that time you was in the company with the defendant, Jesse Reams?

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial, tending to prove no issue in this case.

"The Court: Sustained at this time; I think the time ought to be fixed.

"Q. I will ask you if on Sunday previous to this homicide you was in company with the defendant Jesse Reams in Church?

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial, not proper rebuttal evidence, not impeaching testimony, it is on an immaterial matter.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"Q. Just state.

"The Court: You may answer the question.

"A. If I was with him on Sunday previous to that?

"Q. Yes. A. Not previous to the shooting, I think.

"Q. When was it?

"Mr. Foster: Objected to as incompetent, irrelevant and immaterial, tending to prove no issue in this case.

"The Court: Objection sustained.

"Q. Was it the second Sunday?

"Mr. Foster: No foundation laid for this, it is impeaching evidence.

"The Court: Do I understand you are going to carry this on?

"Mr. Speakman: No sir, just what I talked over with you in the room.

"The Court: I understand the witness to say she wasn't with him Sunday prior to the shooting.

"The Court: Did you answer you wasn't with him prior to the shooting? A. No, only he was at our house for meals.

"Q. You wasn't with him at the church? A. Not that Sunday.

"Q. Not that Sunday?

"The Court: Objection sustained.

"Q. In order to refresh your memory I will ask you if—

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial.

"The Court: Objection sustained, the question was ruled out.

"Q. I will ask if previous to this homicide you was with the defendant at church?

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial, not proper impeaching question.

"The Court: Objection sustained.

"Mr. Speakman: It was on the same occasion.

"The Court: You may ask about that if that is the purpose to ask about that proposition you may do so.

"Q. Just state whether or not you was with the defendant at church at the school house near Sparks previous to this homicide.

"Mr. Foster: Objected to as incompetent, irrelevant and immaterial.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"A. I was at church with him.

"Mr. Foster: Object to this unless the time is fixed.

"Q. How long before the homicide was that, do you know? A. I judge it was about two weeks.

"Q. Two weeks. Just state— did you go home with him? A. Yes, sir.

"Q. Just state what the defendant said to you or if he made any proposals to you on the way home?

"Mr. Foster: Object to this as incompetent, irrelevant and immaterial.

"The Court: Objection overruled.

"Mr. Foster: Not proper rebuttal or impeaching testimony.

"The Court: It is proper rebuttal.

"Mr. Foster: If he brings out part of a conversation we could bring out all of it and it is never competent. What is the rebuttal part, that he had the conversation.

"The Court: No sir, that is proper to show his relation and attitude towards his wife, it may be taken into consideration by the jury for that purpose.

"Mr. Foster: To which ruling the defendant excepts.

"Q. Just state what he said to you? A. Coming home from church?

"Q. Yes, mam.

"Mr. Foster: Object to this last question as above.

"The Court: Objection overruled.

"Mr. Foster: To which ruling the defendant excepts.

"A. He said if he would promise me to marry me would I let him have his way.

"Q. If he promised you to marry you would you let him have his way? A. Yes sir.

Take the witness.

"Mr. Foster: Move to strike the answer out as incompetent, irrelevant and immaterial, not tending to prove any issue in the case, a provisional question that doesn't show any present proposal and doesn't show any element of it could be followed by either party for the woman testified herself she was married at the time herself and we know he was married. It is a question anybody could ask a woman; 'If I will promise to marry you will you let me have my way?'

"The Court: It is a question that is susceptible to more than one interpretation. The jury might infer he had one meaning and in fact he had another and perfectly proper meaning. I will let it go. It may go.

"Mr. Foster: To which ruling the defendant excepts."

CROSS EXAMINATION.

By Mr. Foster:

"Q. He always treated you as a gentleman, didn't he? A. Yes sir.

"Q. As far as you know he is a perfect gentleman? A. Yes sir.

"That is all."

The admission of this testimony was assigned as grounds for a new trial in the motion for a new trial, and is assigned as grounds for reversal in this court.

It is contended on behalf of the plaintiff in error that the testimony last referred to was highly prejudicial to his rights, and under no state of the case competent for any purpose, and that his contention is sound, and supported by an unbroken line of authorities.

It is contended on behalf of the state that the testimony in question was admissible for the reason that plaintiff in error voluntarily raised the issue of his affection for his wife. Therefore, and on account of the fact that he had testified that he still loved his wife and still desired her to live with him, the state contends that he voluntarily introduced the issue in the case, and therefore it was not only the privilege, but the duty of the prosecuting attorney to introduce this testimony in question to show what he terms "the true relation" between plaintiff in error and his wife.

We are unable to see that the issue here in question has any material bearing upon the real issue in this case, to-wit: Whether or not the plaintiff in error was guilty of the murder of Sam Huggins.

Counsel for the state rely on the doctrine announced by this court in *Caples* v. *State,* 3rd Okla. Cr. 72, 104 Pac. 493, as justifying his position in attempting to and in securing the introduction of the testimony herein set out. Caples was charged with killing Finley. In his defense he offered testimony to show that he assaulted Finley because the latter had insulted his wife by offering her money to have sexual intercourse with him. The court admitted this testimony for the purpose of allowing the jury to consider the same in mitigation of punishment, if it should find the accused guilty. In turn the state was permitted to show that the accused was living in a house of prostitution wherein inmates who had been tried and convicted of immoral conduct resided and were the principal occupants, and on that account Caples knowing all these things had subjected his wife to these conditions voluntarily, therefore the state had a right to meet the proof offered, not as a part of its case but to prevent the jury from being misled as to the truth, and thereby administer an inconsequential punishment.

In discussing this proposition this court, in affirming the conviction, held: *That Caples having injected that issue was not in a position to complain when the state showed that as a matter of fact Caples had carried his wife to an immoral resort and*

*subjected her to such suggestions.* And among other things, the court said: (3rd Okla. Cr., p. 91, 104 Pac. 501, 26 L. R. A. (N. S.) 1033.)

"When a man marries a woman to escape prosecution for her defilement, and takes his wife into an immoral resort, and absents himself from her and leaves her to come in personal contact with the lecherous libertines who congregate at such places, he has no one but himself to blame if she is improperly approached. When under these circumstances the defendant claims that such an insult constitutes mitigation for attempting to kill the party making it, it is clearly the right of the jury to know the defendant's action in exposing his wife thereto, as well as other facts which would shed any light upon the transaction, in order that they may understand the true motives of the defendant in making the assault, and determine as to whether or not it constituted mitigation or aggravation; whether the assault was the result of wounded honor, or grew out of a desire to establish the reputation of being a dangerous man. The defendant having voluntarily injected this issue into the case, is in no condition to complain at the action of the court in admitting the evidence objected to. Having opened the door of inquiry as to this matter, he cannot in reason and justice demand that it be closed before the state had been heard in reply. Under these conditions he cannot say that the evidence admitted was improper, although under other conditions it would have constituted reversible error. This question has already been passed upon by this court adversely to defendant's contention in the case of *Cannon v. Territory,* 1 Okla. Crim. 600, 99 Pac. 622. In the light of the entire record there was no error in the rulings of the trial court on this question."

The doctrine in the Caples case is not applicable to the facts disclosed by the record before us. There is nothing in this record to indicate that this plaintiff in error ever at any time subjected his wife to improper proposals from other men, or at any time condoned or tolerated such conduct. The quotation from the Caples case indicates the condition what the record discloses in that case. The language used by the court in the opinion must be applied to the state of facts under discussion and not to a general doctrine that the state can show the true relationship existing between a person charged with crime and his wife under any and all circumstances.

The doctrine in the Caples case and the reason therefor is clearly distinguishable from the doctrine contended for by counsel for the state in the case at bar.· No such issue is raised in this case as was under consideration in the Caples case.

Counsel for the state further contends that the testimony in rebuttal was admissible for the purpose of impeaching the plaintiff in error. This contention is without foundation. One cannot, as a general rule, be impeached upon an immaterial or collateral issue, nor upon statements as to immaterial matters brought out on cross examination.

Counsel for the state further contends that the doctrine laid down by this court in *Goben* v. *State,* 7th Okla. Crim. 190, 122 Pac. 198, where a person on trial for crime makes a voluntary statement on the witness stand, although it may not be relevant to the issue on trial, the state has a right to go fully into the facts on cross examination and in rebuttal.

The rule in the Goben case has no application to the doctrine contended for by counsel. In the Goben case, plaintiff in error testified in his own behalf and voluntarily stated that he had been granted the privilege of selling whiskey by the county attorney, and offered that testimony as a defense, and went at length into details: The county attorney, in turn, in common fairness and justice to himself was permitted to' prove that the accused was lying. A public officer has the right to refute such charges by offering testimony to show that they were absolutely false. We simply held that this was not error because of the circumstances under which it occurred. The testimony in question in the case at bar was not only incompetent for the purpose for which it was offered but was incompetent for any purpose. ·The defense here was not based upon any contention that the county attorney had authorized the killing in question. The remark objected to by the county attorney is insignificant. The record before us indicates that he was more than zealous in the prosecution of the plaintiff in error. When the state went into cross examination of plaintiff in error, and asked him about his relationship with the

woman Carnes, and the woman Paul, error was committed and even though it had not been when the plaintiff in error denied having any improper relation with them, or making any improper proposals to them, the state was bound by the answer and could go no further. The issue was entirely foreign to the merits of the case and highly prejudicial.

It is a matter of common knowledge among those who are versed in court affairs, and especially in the trial of criminal lawsuits, that many times, the injection of issues foreign to the merits of the case so affects the minds of the jurors that a fair and impartial trial and a just verdict cannot be had.

The disclosures offered by the testimony in question are such that no doubt serious prejudice was aroused in the minds of the jury against plaintiff in error. Regardless of his culpability and his relationship with other women he had the right to be tried fairly and impartially on the charge of murdering Huggins, and not to be prejudiced by the injection of testimony which tended to show he had made improper proposals to the wives of other men. To approve the introduction of this class of testimony and undertake to modify a judgment so that substantial justice would result would be assuming a heavier burden than this court feels warranted in undertaking. We feel, therefore, that the judgment should be reversed, and plaintiff in error granted a new trial, and it is so ordered.

DOYLE, P. J., concurs.