# T. J. SCOTT *et ux.* v. STATE.

No. A-2289.   Opinion Filed March 20, 1917.

(163 Pac. 553.)

1. **CONSPIRACY—Homicide—Aiders and Abettors—Manslaughter.**
Proof that one defendant committed an assault with a dangerous weapon, and that the assault so made and the injury resulting was not and could not have been fatal, and, further, that another defendant, with a different weapon, committed the homicide charged, will not support a conviction for murder or manslaughter against the first person, unless the proof further shows that there was a conspiracy between the parties to perpetrate the homicide, or that the first person aided, abetted, assisted, encouraged, or counseled the party who fired the fatal shot.

2. **WITNESSES—Cross-Examination of Defendant—Scope.** The cross-examination of a defendant who elects to testify as a witness should be confined to the issues or to transactions which are pertinent to the issues.

  (b)  It is the duty of the trial court to confine the cross-examination of any witness to proper channels.

3. **APPEAL AND ERROR—Harmless Error—Cross-Examination.**
Improper cross-examination which clearly discloses the purpose of counsel for the state to degrade or to intimidate a defendant who has the stand as a witness, and which is calculated to prejudice the jury and serves no other purpose, constitutes reversible error.

4. **WITNESSES—Cross-Examination.** For cross-examination held wholly improper and prejudicial, see opinion.

5. **TRIAL—Trial of Joint Defendants—Theory of Case—Homicide.**
When husband and wife are jointly charged with murder, and the proof shows that the wife was engaged in a controversy with deceased, during which shots were fired by both participants, resulting in the injury of each, and the husband, who had the right to defend his family and premises, appeared on the scene after the beginning of the controversy and after his wife had retired from the conflict, and when the proof further shows that there was no word or act of hostility jointly engaged in by the defendants, and no claim is made that a conspiracy existed between them to accomplish the homicide, then the person firing the fatal shot is entitled to have his theory of the case submitted

13 O C R—8

to the jury without being burdened with any hostile act which may have been indulged in by his codefendant without his knowledge or acquiescence.

*Appeal from District Court, Comanche County;*
*J. T. Johnson, Judge.*

T. J. Scott and Annie E. Scott were tried on a charge of murder and convicted of manslaughter in the second degree, and bring error. Reversed, and cause remanded.

*J. F. Thomas, J. E. Michalson, E. L. Gregory,* and *Lewis Hunter,* for plaintiffs in error.

*R. McMillan,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiffs in error, T. J. Scott and Annie E. Scott, husband and wife, were tried at the December, 1913, term of the district court of Comanche county on a charge of murder and convicted of manslaughter in the second degree. The punishment of plaintiff in error T. J. Scott was fixed at two years in the penitentiary, and the punishment of plaintiff in error Annie E. Scott was fixed at one year in the county jail of Comanche county.

The information charges the plaintiffs in error with the murder of George Norton in Comanche county on the 18th day of August, 1913.

From the mass of proof introduced at the trial it appears that the plaintiffs in error resided some 25 or 30 miles from Lawton in a remote and more or less inaccessible district. Each had homesteaded a quarter section of land, upon which there were built meager improvements. Some years after the settlement the plaintiffs in error were married. The plaintiff in error Annie E. Scott was formerly Annie E. McGinley, and had homesteaded a quarter section of land in her own right prior

to becoming the wife of plaintiff in error T. J. Scott. The Scotts were farming in a small way. The deceased, George Norton, was a wealthy cattle man, who appears to have controlled extensive ranching interests in the immediate vicinity of the home of the Scotts. Trouble grew up between the Scotts and Norton on account of the fact that Norton's cattle continually broke into and destroyed the crops raised by them. Litigation ensued, wherein the Scotts recovered judgments against Norton, but the judgments were appealed and long delays entailed in the collection of the amounts assessed as damages by reason of the destruction of these crops. After some years of disagreement, during which considerable hostility growing out of these conditions had arisen, the plaintiffs in error managed to get a loan on their farms and purchased wire, with which their farms were inclosed.

It seems that the country is a rugged one, through which there are few public highways—in fact, none; that the people of the country generally used a passageway that crossed the Scott farm; that in fencing the farm the Scotts closed this road and made a gate for the use of themselves and neighbors. Through this gate Norton and his employees had driven cattle which had scattered out over the farm and damaged the crops of the plaintiffs in error, following which Norton and his employees were forbidden the right to pass through the farm. The gates were locked against them, and they were refused permission to unlock the same or to pass over or through the farm for any purpose.

Much ill feeling seems to have existed between them for the reason, as contended by plaintiffs in error, that they felt that the deceased, on account of his prominence and standing financially, and on account of the poverty of

the plaintiffs in error, was imposing on them; that he had prevented the establishment of a public highway through the community in order to give him an excuse for driving his stock through their inclosures. Many hard things had been said pro and con.

Upon the date of the homicide, Norton and certain of his employees undertook to pass through the farm of the Scotts and through the gate which had been locked against him. They drove by the house, which was near the gate, and asked if the gate was locked. Mrs. Scott told them it was, and that they could not pass through. Norton demanded the key, and it was refused him. He told Mrs. Scott that if she didn't give him the key, he would take the gate down, and that he was going through; that attorneys had advised him that he had a right to go through the premises when he desired. T. J. Scott, the husband, was not at the house at the time. The deceased, Norton, came upon the premises armed with a shotgun loaded with buckshot. After being denied the keys and forbidden the right to pass through the gate and across the farm, deceased directed his employees to take the gate down. Some words ensued between Mrs. Scott, the deceased, Norton, and one of his employees. At about this time T. J. Scott appeared on the scene and asked Norton what he was doing there with a gun. Mrs. Scott testified that she could not see him, but heard some one say, "Get him before he gets to the house," and saw Norton point his gun as though he was attempting to shoot her husband, whereupon she seized a shotgun loaded with bird shot and fired in the direction of Norton, some of the bird shots striking him, causing slight wounds. Norton fired about the same time, the buckshot from his gun wrecking a number of utensils in the kitchen where Mrs. Scott was

standing, one of the shots striking a girl who was working at the place, and one striking Mrs. Scott about the face.

T. J. Scott ran to the house and met the girl who was wounded, and spoke to her; he went on into the house and inquired if Mrs. Scott was hurt, and she told him something had hit her; that she was feeling queer and was dazed. She had already put up the shotgun. Mr. Scott passed on into a south room and told her to go to the girl who had been shot, and before she got to where the girl was, she heard another shot from the rear of the house. She took the girl to the house and bandaged her wounds.

T. J. Scott testified that he was down at his spring on the branch getting water for some calves; that he spoke to Norton, and asked him what he was doing there with a gun, and walked on with his back towards Norton, and heard two shots; that there were some trees in the yard and he could not see Norton; that he ran to the gate, went into the house, saw the girl standing with her arm around a post, and asked if she was hurt; that he ran on into the door and never stopped until he looked through the house; that he looked in at the door. and through a window and saw Norton standing with his gun drawn facing the house; that he could not hear or see Mrs. Scott, and in the house he found her leaning against a middle door, and asked her if she was hurt; that she said something had hit her, but she could not find blood; that he passed on through into another room, secured the rifle, and fired out of the window. This was the shot that killed the deceased. The shotgun wound was insignificant.

The proof all indicates that Mrs. Scott had put up the shotgun immediately upon firing the first shot. There is nothing to indicate that she took any part in the

trouble after she was struck by the shot from Norton's gun, nor that she counseled or encouraged any participation in the same by her husband.

For the purpose of this opinion, the following quotation from the examination of the plaintiffs in error is quoted as it appears in the record:

"By Mr. Henderson: Q. Mrs. Scott, you say you occupied that place about 11 years? A. Yes, sir. Q. During all of that time, was Mr. Scott occupying the adjoining place? A. Yes, sir. Q. He was there when you went there? A. Yes, sir; he owned that place when I went there. Q. A man named Brandenburg made the original filing on the place you now occupy, didn't he? A. On my place? Q. Yes. A. Yes, sir. Q. When you came on to that place, Mr. Brandenburg was occupying it? A. Yes, sir; on that place. Q. Is that the place you first filed on, or did you make filing on the place adjoining it on the west? A. I made a settlement, not a filing. Q. On the place on the west? A. Yes, sir. Q. In making that settlement, you and Mr. Brandenburg had a tent across the line, half on your place and half on his? A. Yes, sir. Q. You lived there with him? A. No, sir. Q. Lived there in the tent with him? A. No, sir.

"By Mr. Thomas: Object to that; incompetent, irrelevant, and immaterial.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. How long did you and Mr. Brandenburg live there in the tent?

"By Mr. Thomas: Objected to as assuming a fact not proven.

"By Mr. Henderson: Q. How long did—how long was you there while Mr. Brandenburg occupied the place? A. He didn't occupy my place where I settled. Q. Where did you settle? The place you are on or the one west? A.

The one west. Q. Brandenburg was on the place that you are on? A. Yes, sir. Q. Just had one tent between you? A. No, sir. Q. Did you say 'Yes' or 'No'? A. I said, 'No.' Q. Where was Mr. McGinley then? A. I don't know. Q. He was living, wasn't he? A. I don't know. Q. You never got any divorce from him until last January? A. No, sir. Q. You don't know whether he is dead or alive? A. I do not. Q. How long have you been separated from your husband known as McGinley?

"By.Mr. Thomas: Objected to as incompetent, irrelevant, and immaterial; improper cross-examination.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Read the question. (Question read.) A. Eleven years. Q. Did you leave Mr. McGinley when you came down to this place with Brandenburg?

"By Mr. Thomas: Objected to; incompetent, irrelevant, and immaterial, assuming a fact not proven.

"By Mr. Henderson: Q. I will ask you if you didn't come with Brandenburg from up in Northern Oklahoma? A. I did not.

"By Mr. Thomas: Objected to; incompetent, irrelevant, and immaterial.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By · Mr. Henderson: Q. Did you leave your husband at the time you came onto this land out there?

"By Mr. Thomas: Objected to, because it is incompetent, irrelevant, and immaterial; not proper cross-examination.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Read the question. (Question read.) A. Did I at the time? Q. Or about the time? A. No. Q. You was not living with him when you came onto this land? A. No. Q. Mrs. Scott, how long did Mr. Brandenburg occupy this quarter section that you now live on?

"By Mr. Thomas: Objected to; incompetent, irrelevant, and immaterial; not proper cross-examination.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Read the question. (Question read.) A. Well, he owned it, I think three years, but wasn't there. Q. Were you there most of the time he was on it? A. He wasn't there. Q. He wasn't there the three years? A. Only at intervals. Q. At intervals? Did you acquire the relinquishment from him or from his heirs? A. From his heirs. Q. He died at Bowie, Tex.? A. No, sir. Q. Died down in Texas? A. So I understood. Q. Was you with him at his death? A. I was not.

"By Mr. Thomas: Objected to because it is incompetent, irrelevant, and immaterial; not proper cross-examination.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Didn't you leave the place up there with Mr. Brandenburg in a wagon just prior to his death and start to Texas? A. I did not. Q. Didn't you leave there in a wagon with him? A. No, sir. Q. Didn't you go down to Texas and was with him at his death? A. I did not. Q. You was not with him at any time on that trip to Texas when he died? A. No, sir. Q. Was he any relation of yours? A. No, sir. Q. How long had you known him prior to the time you came onto this land up here? A. Two years, I think. Q. Where had you known him?

"By Mr. Thomas: The defendants object to that for the same reasons, incompetent, irrelevant, and immaterial; not proper cross-examination.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"A. In the Cheyenne country.

"By Mr. Henderson: Were you living with Mr. McGinley when you first met Brandenburg?

"By Mr. Thomas: We object; same reason.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Read the question. (Question read.) A. Yes, sir. Q. How long after you had known Brandenburg had you separated from McGinley?

"By Mr. Thomas: Same objection.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Read the question. (Question read.) A. Well, I don't know exactly; I couldn't say. Q. I will ask you, Mrs. Scott, if it is not a fact that old man Brandenburg after he came down and made settlement on this land went back to the Cheyenne country and brought you down to occupy these two pieces of land?

"By Mr. Thomas: Same objection; incompetent, irrelevant, and immaterial; not proper cross-examination.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Read the question. (Question read.) A. He did not. Q. Who did you come down here with from the Cheyenne country?

"By Mr. Thomas: Same objection.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"A. Mr. Reeser. Q. Did he have any claim out there about this land?

"By Mr. Thomas: Same objection.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"By Mr. Henderson: Q. Read it. (Question read.) A. He was living on that land. Q. Which quarter was he living on? A. Mr. Brandenburg's. Q. Living with Brandenburg? A. Yes, sir. Q. Brandenburg sent him after you then?

"By Mr. Thomas: Objected to; same objection.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"A. I don't know that he did.

"By Mr. Henderson: Q. How came you to come down there? What occasioned your coming down there?

"By Mr. Thomas: Objected to; same reason.

"By the Court: Overruled.

"By Mr. Thomas: Exception.

"A. I came to locate on a place; to get a quarter of land.

"By Mr. Henderson: Q. Had Mr. Brandenburg advised you about the place or informed you where to come?

"By Mr. Thomas: Same objection; incompetent, irrelevant, and immaterial; not proper cross-examination.

"By the Court: Overruled.

"By Mr. Henderson: Q. Read the question. (Question read.) A. He told me there was vacant land down there. Q. What became of the quarter of land you filed on that you say was west of the original Brandenburg claim, west of the claim you live on now?

"By Mr. Thomas:   Same objection.

"By the Court:   Overruled.

"By Mr. Thomas:   Exception.

"Q.   (Question read.)   A.   It is still there.

"By Mr. Henderson:   Q.   Anybody claiming it?   Did you sell it?   A.   Yes, sir.   Q.   Did you sell it?   A.   No, sir.   Q.   You never got a filing on it.   A.   No, sir.   Q. When you came down there and first resided on this quarter section or there in that neighborhood, old man Cartright lived up the creek, didn't he?   A.   Yes, sir.   Q. You knew him then?   A.   I knew him after I came down there.   Q.   Has Mr. Scott's house always been at the same place on his land that it was at the time of the homicide right at the corner next to your house?   A.   Yes, sir; that one has.   Q.   After Mr. Brandenburg went away or after his death, Mr. Scott boarded with you from that time on, didn't he?

"By Mr. Thomas:   Objected to; same reason.

"By the Court:   Overruled.

"By Mr. Thomas:   Exception.

"Q.   (Question read.)   A.   Taken his meals there.

"By Mr. Henderson:   Q.   I say he took his meals there at your house?   A.   Part of the time.   Q.   Took meals there most of the time, didn't he, Mrs. Scott?   A. Yes, the majority of the time.   Q.   When did Brandenburg leave?   How many years now has he been gone?

"By Mr. Thomas:   Same record.

"By the Court:   Overruled.

"By Mr. Thomas:   Exception.

"A.   You mean when he died?   Q.   Yes, when did he die?   A.   It was in 1905.   Q.   Where did he die.   A. I have been informed he died at Graham, Tex.   I don't know.   Q.   You say Mr. Scott has been living at the house boarding with you most of the time since the time he went away?

"By Mr. Thomas: Same objection; let the same objection go to all of these questions.

"By the Court: Make the same record.

"By Mr. Henderson: Q. You say Mr. Scott has been living at the house and boarding with you most of the time since Brandenburg went away? A. Part of the time. Q. Any one live with Mr. Scott? Q. Yes, sir. Q. Who lived there with him? A. Different ones. Q. Can you name any of them? A. Yes, sir. Q. Who is that? A. Archie Oaks. Q. Archie Oaks? A. Yes, sir; one year. Q. Who else? A. Joe Taylor one season, and different other hands that have been there. Q. Most of the time nobody there but you and him. A. No, sir. Q. Nobody there with you? A. Yes, sir. Q. Who lived with you? A. Different ones. Q. Mrs. Scott, who lived there with you at any time since Brandenburg went away? A. Well, the first one was—

"By Mr. Thomas: Objected to; same objection.

"By the Court: Overruled.

"By Mr. Thomas: Exception."

A similar cross-examination involving the previous married life of the plaintiff in error T. J. Scott was indulged in, but not as extensively. The court gave a lengthy charge in submitting the case to the jury; many paragraphs are complained of.

Counsel for plaintiffs in error contend that the evidence is insufficient to warrant the verdict; that the cross-examination above set forth was prejudicial to the substantial rights of the plaintiffs in error and deprived them of that fair and impartial trial guaranteed by the law of the land; and that the instructions of the court are erroneous, and do not fairly submit the issues to the jury.

In the first place, the evidence is such that the jury would have been warranted in returning a verdict of not

guilty as to Mrs. Scott. In fact, it is doubtful if, under
the proof, a case was made against her. Nowhere in the
record is it indicated that the state tried this case on the
theory that there was a conspiracy between T. J. Scott
and wife to murder the deceased. The instructions of
the court did not submit any such issue. There is no
controversy over the fact that the shot fired by T. J.
Scott resulted in the death of Norton. All of the testi-
mony indicates that Mrs. Scott was not a participant by
word or act in the conduct of T. J. Scott in the firing of
this shot. The court gave no clear charge which fairly
submitted that phase of the case to the jury. There be-
ing no charge submitted as to a conspiracy theory, and
no contention of that kind made on behalf of the state, in
our judgment, the verdict was not correct as to her. The
bird shot wound was hardly serious enough to be called
a wound and could not have contributed to the death of
Norton. Unless there was a conspiracy between the
plaintiffs in error to murder Norton, then the judgment
should not have been rendered against Mrs. Scott convict-
ing her on the information charging murder. If the par-
ties had been acting together under an agreement to ac-
complish the death of Norton, the case would be different,
but the record does not indicate any such conspiracy.
The proof on behalf of the state does not disclose any
such arrangement. Annie E. Scott shot Norton with bird
shot and withdrew from the conflict. This is clear beyond
question. T. J. Scott came upon the scene under con-
ditions heretofore referred to and fired the fatal shot.

He was entitled to have his theory of the case sub-
mitted to the jury under this state of the case, and with-
out being burdened with an instruction which linked his
defense inseparably with the hostile acts charged against

Mrs. Scott even before any conflict had occurred. The instructions are burdened with the idea that the two defendants killed Norton, whereas, under the facts, unquestionably Scott fired the fatal shot and Mrs. Scott had withdrawn from the conflict. The record does not disclose that these parties were guilty of any wrongful conduct when acting together which should have been determined by this trial. If these parties were not guilty of conspiracy to murder Norton, then Mrs. Scott should have been tried for a different offense and Scott for the murder. The instructions do not fairly submit the issues.

The cross-examination set forth was wholly unwarranted and inexcusable. This court has had occasion to discuss conduct of this kind on the part of the trial court and prosecuting officer heretofore. See *Rogers v. State,* 8 Okla. Cr. 226, 127 Pac. 365; *Watson v. State,* 7 Okla. Cr. 590, 124 Pac. 1101, and *Reams v. State,* 12 Okla. Cr. 363, 157 Pac. 273.

In the Reams Case, recently decided by this court, the proposition presented by the cross-examination here exposed was held prejudicial and reversible error. The error is more aggravated in the case at bar than in the Reams Case.

The judgment is reversed, and the cause remanded.

DOYLE, P. J., and BRETT, J., concur.