### MILLER v. TERRITORY OF OKLAHOMA (two cases).

(Circuit Court of Appeals, Eighth Circuit.   December 13, 1906.)

#### Nos. 2,398, 2,470.

1. COURTS—CIRCUIT COURT OF APPEALS—CRIMINAL APPEALS—JURISDICTION.

Judiciary Act March 3, 1891, c. 517, § 15, 26 Stat. 830 [U. S. Comp. St. 1901, p. 554], provides that the Circuit Court of Appeals, in cases in which its judgment is final, shall have appellate jurisdiction to review judgments of the Supreme Courts of the several territories within their particular circuits, etc. Section 5, as amended by Act Cong. Jan. 20, 1897, c. 68, 29 Stat. 492 [U. S. Comp. St. 1901, p. 549], declares that appeals or writs of error may be taken from the District Courts or existing Circuit Courts direct to the Supreme Court in cases of conviction of a capital crime. Section 6 (Act March 3, 1891, c. 517, 26 Stat. 828 [U. S. Comp. St. 1901, p. 549]) provides that the Circuit Court of Appeals shall have appellate jurisdiction to review any final decision in a District Court or existing Circuit Courts in all cases other than those provided for in the preceding section, unless otherwise provided by law, and that the judgments and decrees of the Circuit Court of Appeals shall be final in all cases arising under the criminal laws, except, etc. Held, that the Circuit Court of Appeals has jurisdiction on writ of error to review a conviction for grand

larceny, in violation of the laws of a territory, which has been affirmed by the Supreme Court of the territory.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 1101.

Jurisdiction of Circuit Court of Appeals in general, see notes to Law Ow Bew v. United States, 1 C. C. A. 6, and United States Freehold Land & Emigration Co. v. Gallegos, 32 C. C. A. 475.]

**2. CRIMINAL LAW—WRIT OF ERROR—ASSIGNMENT OF ERROR—SUFFICIENCY.**

An assignment that the court erred in not reversing a conviction on account of misconduct of the presiding judge in making prejudicial remarks, insinuations, etc., with reference to accused, his counsel, etc., as appeared from the record of the proceedings in the district court, was fatally defective for failure to point out in the record the alleged prejudicial remarks, rulings, etc.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 2956.]

**3. SAME—EXCEPTIONS.**

Where the printed record on a writ of error in a criminal case failed to disclose that any exception was saved to certain alleged objectionable conduct on the part of the trial judge, the objection could not be reviewed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, §§ 2665, 2667.]

**4. WITNESSES—CROSS-EXAMINATION—INTEREST.**

It was competent for the defense in a criminal prosecution, for the purpose of impairing the testimony of a witness for the territory, to show his interest by asking him if he had not contributed money to aid in the prosecution, and what his purpose was in so doing.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, § 1195.]

**5. SAME.**

Where an attorney was offered as a witness for the territory in a criminal case, it was competent for the defendant to show that the witness had received a retainer in the case to assist in the prosecution, and also to show in what capacity he was retained.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, § 1201.]

**6. SAME—IMPEACHMENT.**

A witness was asked if stolen property had not been found in his possession and if witness had not been forced to pay for the property. *Held*, that the question was inadmissible, even to affect the credibility of the witness.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1125, 1126.]

**7. CRIMINAL LAW—WRIT OF ERROR—PREJUDICE.**

In a prosecution for larceny, defendant was not prejudiced by certain questions asked a witness by the court concerning a conversation had between witness and defendant, in which witness told defendant that the matter could be fixed up by an explanation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, §§ 3120, 3133.]

**8. WITNESSES—CREDIBILITY—IMPEACHMENT.**

In a prosecution for cattle theft, the credibility of a witness could not be impeached by proof that he had a "sweetheart" who was the niece of a fugitive from justice for murder, or that witness at times had consorted with persons reputed to have been charged with horse theft, etc.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, § 1125.]

**9. CRIMINAL LAW—ERROR—PRESUMPTION—PREJUDICE.**

Where an error is shown in a criminal case, it will be presumed to have been hurtful to the party against whom it has been committed, until it appears to have been rendered innocuous.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, §§ 3090–3099.]

10. LARCENY—DEFINITION.

> Where a territorial statute defined larceny as a taking with a felonious intent to deprive the owner of the property taken, and with intent to appropriate the same to the use and benefit of the taker, an instruction authorizing a conviction if the property was taken by defendant with the felonious intent to deprive the owner thereof was erroneous.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 32, Larceny, § 191.]

In Error to the Supreme Court of the Territory of Oklahoma. For opinion below, see 85 Pac. 239.

S. H. Harris (D. P. Marum, on the brief), for plaintiff in error.

W. O. Cromwell, Atty. Gen. (Don C. Smith, Asst. Atty. Gen., on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The plaintiff in error (hereinafter for convenience designated as the defendant) was indicted, convicted, and sentenced to the penitentiary in the district court of Oklahoma. Territory for the offense of grand larceny in stealing cattle, alleged to be the property of William Louthers. This judgment having been affirmed on appeal to the Supreme Court of the territory, the defendant sued out a writ of error from this court to have said judgment reviewed. The explanation of the two numbered cases is that the first writ of error was sued out from the Supreme Court of the Territory and attested by its clerk. To correct this a second writ of error was taken out in due form from this court, with the proper teste.

The jurisdiction of this court to review the decision of the Supreme Court of the territory is challenged by the Attorney General of the territory. The case of Folsom v. United States, 160 U. S. 121, 16 Sup. Ct. 222, 40 L. Ed. 363, was certified from this court to the Supreme Court to have determined the question as to whether the Circuit Court of Appeals had jurisdiction to review the decision of the Supreme Court of the territory of New Mexico affirming a judgment of the district court in a criminal proceeding, the punishment for which was imprisonment in the penitentiary. As such punishment brought the case within the definition of an infamous crime, as employed in section 5 of the act creating the Circuit Courts of Appeals of the United States, the Supreme Court answered the question submitted in the negative. Thereupon Congress, by Act Jan. 20, 1897, c. 68, 29 Stat. 492 [U. S. Comp. St. 1901, p. 549], amended the act establishing the Circuit Courts of Appeals by striking out the words "or otherwise infamous" from section 5 of the act; the purpose being to confer jurisdiction on the Courts of Appeal to review the decisions of the Supreme Court of the territory in criminal cases, including infamous crimes. In Ex parte Moran. (C. C. A.) 144 Fed. 599, Judge Sanborn, speaking for the court, said:

> "This court has the power to review in that way final decisions of the Supreme Court of Oklahoma in all cases in which the jurisdiction below is dependent upon the citizenship of the opposite parties to the suit, in all admiralty cases, in all cases arising under the patent laws, the revenue laws, and the bankruptcy laws, and in all cases arising under the criminal

laws except in cases of the conviction of a capital crime. [Authorities cited.] The fact may be noticed in passing that this court has the same jurisdiction by writ of error or appeal to review the judgments and decrees of the Supreme Court of Oklahoma that it has to review the judgments and decrees of the Circuit Courts of the United States within its circuit in which its judgments are final. Neither the Supreme Court nor this court has any jurisdiction to review in this way the judgments of the Supreme Court of Oklahoma in cases of a conviction of a capital crime."

The Supreme Court in New v. Oklahoma, 195 U. S. 252, 25 Sup. Ct. 68, 49 L. Ed. 182, has decided that writs of error from the Supreme Court of the United States to the Supreme Court of Oklahoma do not lie even in capital cases.

Counsel for the territory makes the contention that the jurisdiction of the Circuit Court of Appeals lies to review the decisions of the Supreme Court of the territory in criminal cases only where the United States is a party, and consequently where the criminal offense is denounced by federal statute, and not, as in this case, where the crime is proscribed by legislative act of the territory. In support of this proposition the case of Aztec Mining Company v. Ripley, 151 U. S. 79, 14 Sup. Ct. 236, 38 L. Ed. 80, is cited. It is true that in the opinion in that case the learned Chief Justice used the following language:

"By the fifteenth section of the judiciary act of March 3, 1891 (26 Stat. 830, c. 517 [U. S. Comp. St. 1901, p. 554]), the Circuit Courts of Appeals, in cases in which their judgments were made final by the act, were empowered to exercise appellate jurisdiction over the judgments, orders, or decrees of the Supreme Courts of the several territories; but as this case was not a case in admiralty, nor a case arising under the criminal, revenue, or patent laws of the United States, * * * it did not belong to either of the classes defined by section 6 of that act (26 Stat. 828 [U. S. Comp. St. 1901. p. 549]), as cases in which the judgments or decrees of the Circuit Courts of Appeals should be final."

It is evident that the words "of the United States" were either a mere inadvertence or that it was intended to apply alone to patent or revenue laws. The structure of the clause in the statute is, "in all cases arising under the patent laws, under the revenue laws, and under the criminal laws." There is nothing in the language employed by the statute to indicate that a review would not apply to cases arising under the criminal laws of the territory, as well as those of the United States. All statutes enacted by the territorial government are under authority of the organic act; and decisions of the territorial courts, in the absence of some words of negation or manifest omission in the organic act, are reviewable either by the Supreme Court or by the United States Courts of Appeal; and such has been the practice on appeals and writs of error from the Indian and Oklahoma Territories since the creation of the Courts of Appeal.

Turning to the matters sought to be reviewed under this writ of error, they are largely directed to the alleged misconduct of the trial judge in the treatment accorded to counsel for the defendant and his witnesses, and to alleged improper statements made by the judge in the presence of the jury. It is to be confessed that in some respects the trial of the case was conducted in a disorderly manner. It partook too much of a personal altercation among the respective counsel, in which, at times, the court participated. But, after reading the con-

nection in which the matters complained of occurred, we are impressed
with the fact that complaining counsel are not so blameless for the
disagreeable incidents as to entitle them to cast the whole responsi-
bility therefor upon the trial judge. It is a method sometimes resort-
ed to, as reprehensible as it ought to be infrequent, that in defenses
deemed possibly desperate, for counsel by their course of conduct to
so annoy and exasperate the judge as to make him, now and then,
forget the pedestal on which he sits, and by retaliation display an un-
judicial temper and lose his equipoise, in the expectation that thereby
he may be led into the commission of some reversible error. One of
the surest methods for counsel to inspire a proper dignity on the part
of the court and to obtain fair treatment is by their own respectful
deportment and fairness to impress the court with a belief in their in-
tellectual honesty and sincerity, rather than by persistent contention,
contradiction, and wrangling with the court, and at times injecting
improper matters into the trial, invite antagonism from the court and
drive it from its propriety. To many of the unpleasant and reprehen-
sible incidents of the trial complained of by counsel for defendant, the
maxim might well be applied: "Communis error facit jus."

There were three attorneys engaged in the defense. Instead of the
examination and cross-examination of the witnesses being conducted
by one of them at a time, frequently all three interjected questions and
objections, and when discussions arose in the progress of the trial
the three would seem to be on their feet simultaneously, cross-firing
at the opposing counsel and contending with the court. At times they
would interrupt the court in the midst of a sentence being uttered by
him, and, when reproved, the apology offered was after a fashion but
to add to the offense. Had the court asserted its authority by com-
manding ruling and a determined adherence to orderly procedure,
rather than by engaging in wrangling debate and recrimination, both
jurors and spectators doubtless would have been better impressed with
the fact that the courtroom is the sanctuary of justice, always calculat-
ed to promote calm consideration and an unbiased judgment.

Many of the assignments of error discussed in the argument and
briefs are in such disregard of the rules of this court, for the lack of
specifications and reference to where the incidents complained of may
be found in the record, as to disentitle them to consideration. The
following is an example:

"The court erred in not reversing the cause on account of the misconduct
of the presiding judge in making prejudicial remarks and insinuations, orders
and rulings with reference to the defendant, his counsel, witnesses and per-
sons not connected with the cause, as appears from the record of the pro-
ceedings in said district court."

Thus leaving this court to search out through the record the in-
stances sought to be reviewed.

Error is assigned to the action of the court in permitting reference
by the prosecution, before the jury, to the fact that the defendant
below did not testify on the preliminary hearing before the committing
commissioner; but the printed record before us fails to show that any
exception was saved to this objectionable conduct, and therefore it is
unavailing to the defendant.

The same is true of the error assigned respecting the conduct of the court in threatening, in the presence of the jury, the arrest of one Hodges, a witness in the case, who, contrary to the order of the court for the separation of the witnesses during the taking of the testimony, had re-entered the courtroom. If there was any error committed by the court in this occurrence, no exception to its action is disclosed by this record.

In the cross-examination of the witness Downs, introduced on behalf of the prosecution, the following occurred:

"Q. You are the man that contributed to this prosecution?
"A. Yes, sir.
"Q. You contributed to this prosecution for the purpose—
"Mr. Dunn (the prosecutor): Now, if your honor please—
"By the Court: Oh, I know it, Mr. Dunn; I know it. I have asked counsel to try this case like men and like lawyers, but I can't get them to do it. It is apparent to everybody in this room, to the jury and everybody, that we are not trying this case like lawyers, or like men, or like anything else. I don't see how counsel can do it, or why they do it."

To this action of the court an exception was saved. It was certainly competent for the defense, for the purpose of impairing the force of this witness' testimony, to show his interest by asking him if he had not contributed money to aid in the prosecution, and what his purpose was in so doing. It is remarkable that the prosecution should have interposed and cut off the full answer. The contribution made by the witness may have been to engage the services of assistant counsel to aid in the prosecution, and his purpose may have been a commendable one in the advancement of the cause of public justice. These were matters for the consideration of the jury in weighing the motives of the witness and judging of the probity of his conduct and measuring the weight of his testimony. There was nothing immediately connected with this episode to warrant the reproof given by the court to defendant's counsel. As all error committed in the progress of a trial is presumptively hurtful to the party against whom it is committed, until it appears to be rendered innoxious, the defendant has just cause to complain of this action of the court as prejudicial.

The action of the trial court on the cross-examination of the witness Mountell by the defendant is criticised. It seems that the witness is a lawyer, who was present at the preliminary hearing before the commissioner, but did not testify therein. Since the preliminary hearing he has been employed to assist in the prosecution. Having gone upon the witness stand to testify in behalf of the territory touching certain inculpatory statements of the defendant, it was sought on cross-examination to make the witness, in effect, admit that he had accepted $250 to testify in the case. The court interposed with a reprimand for thus insulting the witness. As this case is to be remanded for a new trial, it is sufficient to say that it is competent for the defendant to show that the witness has received a retainer in the case to assist in the prosecution, and to show in what capacity he was so retained; but this, like everything else connected with a judicial inquiry and investigation, should be done decently and respectfully, by proper questions developing the facts, without counsel interjecting

the assertion imputing corruption on the part of the witness without proper foundation therefor.

Criticism is made of the action of the trial court while the witness Johnson, who was a deputy sheriff, was being cross-examined by defendant's counsel. The first gross offense against legal propriety and professional conduct was committed by counsel for the defendant. Questions were propounded to the witness in a manner to put words in his mouth which he did not utter; and the witness seems to have become frightened or embarrassed, at which the court reproved him for not speaking out and testifying. Thereat one of the counsel for the defendant bluntly asked the witness if stolen property had not been found in his possession not a great while ago; and, when the court started to say he would not permit this, the said counsel, in utter contempt of the court's interposition, continued, "in which you were forced to pay for the property." The court then observed:

"There is no reason here why this witness should be insulted because he comes on the witness stand. If Mr. Johnson stands convicted of any act, or accused of it in any manner that would make it competent, that, of course, would be allowed to be shown. Mr. Johnson, what do you mean when you told the defendant that it wasn't too late to fix this matter up with an explanation?"

The witness then proceeded to state the meaning of what he said in that connection, whereat the court said:

"You mean to state you meant to tell him, if there was an explanation that there was no crime in it, that would be the end of it?"

Thereupon one of counsel for defendant excepted to the question of the court, and another of counsel for defendant interposed by saying:

"His intentions were evident. You are taking the wrong view of what—
"By the Court: Did you intend to convey the idea to him that you in any way would be instrumental in fixing up the case?
"By Defendant's Counsel: Wait.
"A. No, sir."

One of the counsel objected to the evidence as incompetent, irrelevant, and immaterial, and another co-counsel said: "We desire to reserve our exceptions." The witness then said:

"Well, am i allowed to explain further in regard to that?
"By the Court: I understand what you have said. If you have any other explanation, you may state it."

Further colloquy and wrangling ensued between counsel and the court. It would be discredible to counsel's competency as lawyers to impute to them lack of knowledge of the inadmissibility of such evidence even to affect the credibility of the witness. See Glover v. United States (C. C. A.) 147 Fed. 426, recently decided by this court. As the question should have been excluded, and the explanation given by the witness was not even inculpatory, the question put to him by the court as to the effect of his meaning furnished no ground of error of which the defendant can be heard to complain.

On cross-examination by the prosecuting attorney of the witness George Hodges, an alleged accomplice of the defendant on trial, the

prosecuting attorney, over the objection of defendant, was permitted to interrogate the witness as to whether he did not have a "sweetheart" by the name of Chaplain, who stayed at a certain hotel where the witness boarded, and whether she was a niece of one Sam Green. This was followed up, against the protest of defendant's counsel, with the following question:

"He is a fugitive from justice, isn't he, charged with the murder of the sheriff of Custer county?"

The objection to this was at first sustained. Then there occurred the following:

"Q. She [the witness' sweetheart] is a sister of Bud Chaplain, who was a member of the Perkins gang, was she not?"

This was objected to; but, without ruling by the court, the prosecuting attorney followed with this question:

"Q. And who was a fugitive from justice from Woods county, is that true?"

The court at first sustained the objection to this question. After argument pro and con in the presence of the jury, in which the prosecuting counsel assumed that said Green and Chaplain and others were thieves or murderers and fugitives from justice, the court took a recess for consideration, after which it admitted the questions and required the witness to answer. He denied any knowledge that Chaplain was a fugitive from justice for cattle or horse stealing. He was then required to answer if he did not know that Chaplain was a member of the Perkins gang, which he denied, but in answer to further interrogation admitted that he knew Perkins and that he knew Sam Green. Then the question was renewed if he did not know that Green was a fugitive from justice for cattle stealing and murder, to which the witness answered that he did not know of his being a fugitive for cattle stealing, but he had heard that he was for murder. A similar inquiry was permitted as to whether the witness did not know a man by the name of Bishop, to which he answered that he did. The following then occurred:

"Q. Were you not pursued and chased by Mr. Bishop—
"By Mr. Noah (of counsel for defendant): Now, that is objected to.
"Q. And charged with larceny of his horses?
"By Mr. Noah: That is objected to as incompetent, irrelevant, and immaterial; not proper cross-examination.
"By Mr. Snoddy (another of defendant's counsel): There is no evidence that he was chased by somebody.
"By Mr. Noah: That would come under the rule which the courts lay down of persons convicted of a crime. That may be inquired into after conviction, but the conviction only works that.
"By the Court: That is the rule upon which the courts seem to be hopelessly divided. I don't know what our Supreme Court holds."

The court, after further colloquy, said:

"I believe I will sustain the objection to this particular question."

Counsel for the prosecution then passed to another matter:

"Q. Do you know Pete Whitehead?
"A. Yes, sir.

149 F.—22

"Q. He also worked out there, when you did, with you, didn't he?

"A. No, sir.

"Q. You know that he is a fugitive from justice for stealing horses, don't you?

"A. I have heard—

(Here objection was interposed.)

"By the Court: I don't think it is competent unless you show the association.

"Q. Where did he stay?

"A. I never seen the man but a very few times in my life.

"Q. Didn't he stay there at Cooley's and at Mr. Lee Gray's ranch?

"A. No, sir; he never—"

This was, to say the least of it, an extraordinary proceeding. Even were it conceded that the credibility of a witness might be attacked because of his association with criminals, no foundation whatever was laid as a basis for the question. For aught that appears, the witness' sweetheart may have been as pure and spotless as the driven snow; and forsooth she might have been the niece of a fugitive from justice for stealing cattle or murder would not disentitle her to reap the reward of her own virtue or to enjoy the respect of good people. There was no proof offered whatever to sustain the imputation conveyed in the questions and the argument of counsel before the jury that Sam Green, Chaplain, and others· were theives, or murderers, or fugitives from justice. They were not shown to be bad men, much less outlaws. An accused person might flee from arrest and yet be innocent. His flight would only be a circumstance to add to the sum of other inculpatory facts in evidence where he is on trial. The important and essential fact of guilt the prosecuting attorney was permitted by his questions to assume. The only conceivable purpose of such inquiry was to affect the credibility of the witness. The proper limitation placed upon such inquiry by the courts, recognizing an attack upon the character of a witness for gross immorality, is that it must pertain to his personal turpitude, such as to indicate such moral depravity or degeneracy on his part as would likely render him insensible to the obligations of an oath to speak the truth. In his treatise on Evidence (volume 2, pars. 923, 924), Mr. Wigmore, after asserting the better rule to be that the veracity of the witness is the only proper subject of inquiry, and, therefore, no question can arise as to admitting character for any other trait, says:

"But in jurisdictions where bad general character may be used, the question must also arise whether some other specific vice or group of vices is not as significant as bad general character in indicating a degeneration of the truth-telling capacity. One of the objections, indeed, urged against the use of bad general character, is that it necessarily brings in its train a number of consequential difficulties such as this. The better opinion, and the one usually reached, is that, in spite of logic's demands, policy requires that the line be drawn at bad general character, and that no specific quality other than that of veracity be considered."

It is certainly without authoritative precedent that a witness' credibility may be impeached by proof tending to show that he has at times consorted with persons reputed to be theives, and the like. If this

were the law, we apprehend few men who have stayed on cattle ranches in Oklahoma, among an indiscriminate lot of what is known as "cow boys," might safely go upon the witness stand without being subjected to just such an attack as was made upon the witness Hodges. Such license of attack upon witnesses would make the courtroom a terror to honest men, and would justify their flight from the summoning officer. The foregoing incident strikingly illustrates where the responsibility for the miscarriage of justice in criminal prosecutions should sometimes be placed, instead of imputing the reversal of convictions by the appellate courts to what is popularly termed "mere technicalities." The zeal, unrestrained by legal barriers, of some prosecuting attorneys, tempts them to an insistence upon the admission of incompetent evidence, or getting before the jury some extraneous fact supposed to be helpful in securing a verdict of guilty, where they have prestige enough to induce the trial court to give them latitude. When the error is exposed on appeal, it is met by the stereotyped argument that it is not apparent it in any wise influenced the minds of the jury. The reply the law makes to such suggestion is: that, after injecting it into the case to influence the jury, the prosecutor ought not to be heard to say, after he has secured a conviction, it was harmless. As the appellate court has not insight into the deliberations of the jury room, the presumption is to be indulged, in favor of the liberty of the citizen, that whatever the prosecutor, against the protest of the defendant, has laid before the jury, helped to make up the weight of the prosecution which resulted in the verdict of guilty.

In its charge to the jury, in defining what facts the jury should find to constitute the offense of larceny, the court in the last division of this submission said:

"That the property was taken by the defendant with the felonious intent to deprive the owner thereof."

The statute of Oklahoma adds to this definition the requirement that the caption must have been "with the intent to appropriate the same to his own use and benefit." The instruction, therefore, fell short of the statutory definition, and was erroneous.

Criticism is made in the brief of counsel for defendant upon other portions of the charge of the court to the jury, to the giving of which the record before us fails to show that any exceptions were taken, and, if the objections had been properly saved, the charge as a whole properly cured the alleged defect.

For the foregoing errors, the judgment of the Supreme Court of the territory must be reversed, and the cause remanded to the district court, with directions to set aside its judgment and the verdict, and grant a new trial.