## TILLMAN JONES v. STATE.

No. A-2878.   Opinion Filed March 5, 1921.

Rehearing Denied Nov. 19, 1921.

(201 Pac. 664.)

(Syllabus.)

1. **Jury—Examining Veniremen—Not Allowable to Ask Jurors How They Would Decide on an Assumed State of Facts.** In the examination of a venireman as to his qualifications to sit as a juror, neither party has the right to assume the facts of the case in detail, and assume that the court will instruct the jury in a particular way, and then call upon the prospective juror for a statement as to how he would decide under this supposed state of evidence. This might be calling for a prejudgment of the case, and the sustaining of an objection to such question is not error.

2. **Same—Examination of Jurors—Discretion of Court.** The manner and extent of examinations of jurors, touching their qualifications, cannot be prescribed by any definite, unyielding rule, but rests to a large extent in the sound discretion of the trial judge. In the examination, such latitude should be given the parties as will enable them to procure a jury free from outside influence, bias, or personal interest. Held, that the limiting of the examination of Juror Brown was not an abuse of the court's discretion.

3. **Appeal and Error—Harmless Error—Disparaging Remarks by Court Concerning Attorneys.** The trial court should refrain from making disparaging personal remarks concerning any of the attorneys engaged in the trial. The attorneys, on the other hand, should refrain from unnecessarily irritating the court. A trial in a court of justice should not be permitted to degenerate into a contest of wits or skill between the court and attorneys, or between the attorneys themselves. Held, in this case that the attorneys for defendant were in some measure responsible for the disparaging remarks of the court, and that the remarks so made, under all the circumstances, were not prejudicial.

4.  **Witnesses—Good Character of Accused—Impeachment—Other Offenses.** Unless the defendant himself puts his good character in issue, it is not admissible, on cross-examination of the defendant, to interrogate him as to the commission of other particular crimes or offenses not connected with the crime for which he is being tried. If the good character of the defendant is made an issue by the defendant, it may be impeached only by showing that his general reputation was bad, and not by evidence of particular acts.

5.  **Appeal and Error—Harmless Error—Interrogation as to Other Offenses.** As to whether the error in permitting a defendant to be interrogated about several other specific acts of wrongdoing, not within the issues, is prejudicial depends upon whether, from an examination of the entire record, it appears that the defendant was injured by such testimony, or whether the jury considered the same in arriving at their verdict. Held, in this instance, that the propounding of the questions complained of was not prejudicial error.

6.  **Same—Test as to Harmless Error.** As to the tests in determining whether incompetent testimony is harmless, see the text of this opinion.

7.  **Homicide—Harmless Error—Instruction.** The giving of an instruction to the jury that, if they should find the defendant guilty of murder, they should fix his punishment at life imprisonment in the state penitentiary, is error. By statute it is provided that the punishment for murder shall be death or imprisonment for life, at the discretion of the jury; but, since this error was prejudicial only to the state, the defendant cannot be heard to complain.

8.  **Homicide—Instructions as to Self-Defense.** Instructions as to self-defense and apparent danger examined, and held sufficiently, if not correctly, stated.

9.  **Appeal and Error—Invited Error—Remarks by Court.** Where the defendant's counsel, in the presence of the jury, unnecessarily provokes the court to making disparaging remarks of and towards the attorney for the defendant, culminating in a fine or threatened fine for contempt of court, the defendant, will not be heard to complain of such action of the court, unless it appears that it probably operated to the injury of the defendant.

Appeal from District Court, Texas County; W. C. Crow, Judge.

Tillman Jones was convicted of murder and he appeals. Affirmed.

J. S. Harris, W. H. Sullivan, and John L. Gleason, for plaintiff in error.

S. P. Freeling, Atty. Gen., and R. McMillan, Asst. Atty. Gen., for the State.

BESSEY, J. The plaintiff in error, Tillman Jones, hereinafter referred to as the defendant, was on the 1st day of May, 1915, informed against in the district court of Texas county, Okla.; for the murder of Paul Herzog on the 29th day of November, 1914. Upon trial in said court, defendant was on the 27th day of May, 1916, convicted of murder, and his punishment fixed at life imprisonment in the state penitentiary.

The evidence on the part of the state discloses: That prior to the day of the homicide there had been no ill feeling between the defendant and the deceased; that the deceased was a school teacher, a young man of exemplary habits, who was not in the habit of drinking intoxicating liquor or using profane language. That immediately prior to the date of the shooting the deceased lived a distance of about two miles from the father of the defendant, with whom the defendant had for some time been making his home. That on this day the deceased had been to Tyrone, in company with others, and that on their return, about sundown, he left their conveyance some distance from his home and was proceeding on foot, carrying a sack of flour and a package of salt, when he overtook the defendant, who, after some remarks, demanded of the deceased that he hitch up his team and take defendant and his trunk to Tyrone. That the defendant was in an intoxicated condition, and stated that he had had a dispute with his father, who did not want him to go to Tyrone. That the defendant had a pistol, and threatened to shoot the deceased if he did not go. That the deceased then car-

ried the flour and salt to his house, and there met his wife and called her attention to defendant's intoxicated condition. That he then went to the stable, hitched up a team of mules to a wagon, and, after again going to the house and giving his pocketbook to his wife drove away with the defendant in the direction of the home of the latter. That on their arrival there the defendant's father objected to his taking the trunk, but later the trunk was placed on the wagon, and deceased then stated that he did not want to take the trunk if the father objected. After some discussion the deceased got up on the wagon, preparatory to driving off and invited the defendant to get on also; that the defendant refused, stating that he would walk down to the gate and close it after they drove through. The deceased got off of the wagon, urging the defendant to get on, and as he approached the defendant, the defendant shot him with his pistol, the ball entering the abdomen, severing the intestines in a number of places, resulting in death some hours later. The defendant, immediately after the shooting, fled, and some months later was apprehended and arrested in Tennessee. The pistol which he had used was found some distance from the scene of the tragedy. The deceased had no gun or other weapon, and had made no threats towards the defendant. That the deceased was carried into the Jones house, physicians were called, and his relatives notified. That the physicians, after their arrival, decided that an operation was necessary, and as soon as preparations could be made they placed deceased under the influence of an anesthetic, opened up the abdomen, and sewed up the punctures in the intestines. That before the operation the father and sister of the deceased arrived; that the deceased knew that he could not recover, and before the operation made a statement to his father, in the presence and hearing of his sister, relating how the difficulty took place. That it required approximately an hour and a half

to complete the operation, and soon after the deceased came from under the influence of the anesthetic, at about 1 o'clock of the morning following, a hypodermic injection of H. M. C. was administered. That some time following this the deceased made a statement as to how the difficulty occurred to his mother-in-law; and later still, at about 5 o'clock of that morning, he made another statement, a portion of which was reduced to writing. These dying statements all indicated that the shooting was done without provocation.

The defendant admitted the killing, and claimed justification. He admitted that he had seen the deceased a few times, and knew him slightly. That he went over to the home of the deceased at about sundown on the evening of the 29th of November, 1914, to get him to haul his trunk to Tyrone, and that the deceased overtook him a short distance from his house. That he told the deceased that he wanted him to take him and his trunk to Tyrone, and that he gave him $1 for that purpose. That he had a pint of whisky with him, and that he gave deceased a drink just after they met; that before leaving the defendant had taken a drink or two. That they hitched up the team of mules and drove over towards the defendant's home. That on the way over the deceased took two more drinks, and that somewhere along the road the deceased said to the defendant, "Jones, I understand that you said that I stole some of your fruit down there," and that the defendant replied to the effect that it looked like either he or some of the Hoeckendorf boys did. That the deceased then cursed him, and started towards him, whereupon defendant got off the wagon and ran back up the road a distance of about 100 yards, pursued by the deceased. That the deceased failed to overtake the defendant, and, after using more profane language, returned to the wagon, and that the defendant followed and they both got on the

wagon and pursued their journey towards the Jones home. That after arriving at his home they both went into the house, and that the deceased continued cursing and using profane and abusive language in the presence of defendant's father and mother. That defendant's gun and scabbard were in the cupboard. That he got them, and buckled them around him, after which deceased and he together loaded the trunk on the wagon. The deceased got on the wagon and picked up the lines and invited the defendant to get on. Defendant refused and said he would walk down to the gate and shut it. After some talk the deceased said he didn't believe that he would take the defendant to town; that the defendant insisted that he do so, and that the deceased then cursed the defendant again and said, "You accused me of stealing, and I am not going to stand for it," and got off the wagon and started towards the defendant. That defendant retreated, and told the deceased to stop, and that the deceased then reached in his bosom and threatened the defendant with what seemed to be something bright in his hand. That the deceased kept advancing, and that the defendant then shot him. The defendant then related the details of his flight to Tennessee.

The defendant admitted that he had drunk whisky nearly all of his life; that he had been drinking on that day; that he had whisky at home, and filled up his pint bottle before he started to the home of the deceased; and that he had taken a drink or two before starting.

The only eyewitness to the shooting was Herman Hitchcock, a brother-in-law of the defendant. He testified that the shooting occurred in front of the Jones home, about 30 minutes after the arrival there of the two men. That the night was clear, as well as he could remember, and that the moon was shining. The witness corroborated the defendant as to the abusive and profane language alleged to have been

used by the deceased, and stated that just before the fatal shot was fired the deceased was advancing towards the defendant, in a threatening manner, reaching in his inside overcoat pocket, and that he had something bright in his hand.

A number of witnesses testified as to what took place after the shooting. Expert and other witnesses testified as to the mental condition of the deceased after the shooting and before his death, as affecting the credibility of his dying statement. The father and mother of the defendant did not testify. Other than above stated, there was no testimony that the deceased had a weapon, and so far as this record shows, none was found on his person or elsewhere.

The record in this case is ponderous, containing 826 pages. The defendant urges 48 assignments of error. From an analysis of defendant's brief, we find that these errors may be classified and grouped as follows:

(1). Error of the court in refusing to permit the defendant to make a sufficient examination of the jurors touching their qualifications.

(2). Error of the court in permitting the county attorney and special counsel for the state to make prejudicial remarks about the defendant and his counsel, and permitting prejudicial questions to be propounded, indicating that the defendant was a dangerous man.

(3). Error of the court in giving erroneous instruction as to the death penalty.

(4). Errors of the court in the admission of incompetent and prejudicial testimony concerning the alleged dying declarations of the deceased.

(5). Errors of the court in giving certain erroneous instructions, and the refusal of the court to give the instructions offered by the defendant.

(6). Error of the court in fining one of the attorneys for the defendant for contempt of court, in the hearing and presence of the jury.

First.    This was not such a trial as would ordinarily excite wide publicity or make it difficult to procure an impartial jury.    There were 33 persons examined as to their qualifications as jurors, covering 222 pages of this record.    The friction and hostile feeling between the court and the attorneys for the defendant, which appears at various times during the progress of the trial, as shown by this record, first manifested itself and became acute because,  in this examination of prospective jurors, the attorneys for the defendant would take the information and the list of witnesses which it contained and ask each man examined concerning his relationship with each of the witnesses, and propound assumed instructions which the court would give, asking the jurors whether, if so instructed, they would be governed by such instructions.    Several times the court suggested that they should not at that time assume what his instructions would be.    Finally the court urged that such prolonged examination cease, culminating in the conflict complained of between the court and the attorneys for the defendant, relating to the examination of Juror Brown, who had before that time been examined at great length, and, as probably appeared to the court, to a sufficient extent.    The court then announced that he could and would take the examination out of the hands of the attorneys for the defendant, and refused to allow them to ask this juror further questions, as follows:

"Q. You understand that that (reasonable doubt and presumption of innocence) is a valuable and legal right which the law extends to a defendant, and that the jury or juror has no right to withhold from him, do you?

"By the Court: I think you gentlemen go into the law and argument, and I am going to limit this time on the examination—the law doesn't give you any right to do this, and unless you abbreviate it, I am going to limit the time. You go into the law and arguments, and have no business of doing so in this examination. It is rather in the nature of grandstanding, and you get out here and take up too much time; if you gentlemen want to do any advertising, anything of that kind, you can do so in the newspapers.

"By Mr. Gleason: We except to the ruling of the court and the remarks of the court.

"By the Court: I really have the right to take it out of your hands, and that is what I will do if you don't take up less time. I will just examine these jurors myself. I can examine the whole of them in 30 minutes. Let's abbreviate this; if you want to examine, let's get through with it.

"By Mr. Gleason: Well, if the court please, I confess my inability to examine in accordance with anyone but my own ideas. I am willing—

"By the Court (interrupting): I think you have asked this fellow enough questions, both sides, for the examination of him have asked him about everything that could possibly be connected with the case in any way.

"Q. (addressing Mr. Brown). You would follow the instructions in connection with this case, would you, Mr. Brown? A. Yes, sir.

"Q. And base your opinion solely on the law and evidence, as your verdict? A. Yes, sir.

"Q. You would come to no conclusion until the case was finally submitted to you? A. No, sir.

"Q. You have no preconceived opinion of this case that will interfere with your verdict? A. No, sir.

"By the Court: I don't see that there is anything else that amounts to anything in connection with this examination here.

"By Mr. Gleason: The defendant excepts to the remarks of the court, criticizing counsel for defendant and further excepts to the remarks of the court—to the action of the court in taking from the defendant the right to interrogate—(Addressing the court:) We have not completed our examination of the witness, if the court please.

"By the Court: Yes; you have and you ain't going to examine him any more.

"By Mr. Gleason: We except to this, and ask the right to further examine. (Addressing the court:) Does the court refuse our right?

"By the Court: Yes, sir.

"By Mr. Gleason: Note our exception."

It has often been held that the manner and length of such examinations rest in the sound discretion of the trial judge. The length, latitude, and manner of such examinations will necessarily vary in different cases and it would be impossible for this court to prescribe a definite and unyielding rule to be followed in future cases. 24 Cyc. 346; 16 R. C. L. 281, § 97.

The record discloses that hypothetical questions had been propounded to this juror, assuming questions of law and of fact, in which the juror was asked what his decision would be. It is generally held that a party examining a venireman has no right to assume the facts of the case on trial, and to ascertain the juror's opinion on them in advance; and that a hypothetical question put to a venireman, calling for his decision on a question of law and for a statement by him as to the party in whose favor he would decide it in a supposed state of the evidence, calls for a prejudgment of the case, and that the sustaining of an objection to such a question is not error. State v. Huffman, 86 Ohio St. 229, 99 N. E. 295, Ann. Cas. 1913D, 677, and cases cited in notes and annotations.

We think that the examination of this juror, as a whole, showed that he was qualified, and an examination of the 222 pages of this record relating to the qualifications of the jurors shows that the jury, as finally obtained, possessed the requisite qualifications, and was fair to both sides, and that no objectionable juror, from the standpoint of the defendant, was retained.

We by no means approve of the manner and attitude of the court in limiting the examination of this juror, but we hold that, under the circumstances in this case, there was no such abuse of the court's discretion in so limiting this examination as would amount to prejudicial error. Indeed, in view of all that had transpired previously, the hostile attitude of the court and the attorneys for the defendant may have had, and probably did have, a tendency to operate to the advantage of the defendant. The disparaging remarks of the court at this time, in connection with those appearing later in the record, will be treated further in another paragraph of this opinion.

Second. After the unfriendly attitude between the trial judge and counsel for the defendant was manifested in the examination of the jurors, and immediately after the jury was selected and qualified, the county attorney proceeded to make his opening statement to the jury. From this part of the record we get the impression that defendant's attorneys, instead of making an effort to pour oil on the troubled waters, repeatedly interrupted the county attorney's opening statement to the jury by making unnecessary and frivolous objections to portions thereof, to such an extent that he was unable to make to the jury a connected, orderly statement of the state's theory of the case. Frequently the county attorney, same time. The opening statement of the county attorney was short, but, so near as we can tell from the dialogue that the court, and counsel for defendant were all talking at the

took place during these interruptions, there were 14 objections made and argued to portions of this statement, several of which were without merit, as will be seen from the excerpts following:

"The evidence will further show that, just immediately after the shot, Tillman Jones was permitted, and we believe the evidence will show that he was aided, to escape. (Objection; overruled; exception.)"

"Gentlemen of the jury, the evidence will show that, after the officers were notified, that they went to the Jones home and that an effort was made to conceal the identity of the murderer in this case. (Objection; overruled, exception.)"

The county attorney then modified his statement by changing the word "murderer" to the expression, "the man who did the shooting in this case."

"The evidence will show that this defendant became a fugitive from justice, and that the sheriff and other officers of this county made a search for him in many different states, and the evidence will show that the Governor of this state put a price upon the head of this defendant. (To this an objection was sustained, as to the Governor's offer of a reward, and the jury admonished not to consider it.)"

"The evidence will further show that the defendant on trial here is a man who carried a gun, and especially so at public occasions. (Objection; overruled; exception.)"

"The evidence will show that Paul Herzog (the deceased) knew that this defendant, Tillman Jones, carried a gun. (Objection; overruled; exception.)"

"The evidence will show that prior to the occurrences of this day the defendant had threatened the life of Paul Herzog.

"By the Court: The statement will not be taken from the jury at this time."

"The evidence will further show that Paul Herzog was a law-abiding citizen. That he was a peaceful man, and a man above the ordinary in his habits of life. That he never drank liquor or used tobacco, and in fact prided himself on his personal habits.

"By the Court: Well, I don't know that the tobacco part cuts any figure. The liquor proposition I will not eliminate for the present."

At the close of the opening statement, the court instructed the jury as follows:

"The county attorney is no witness in this case. His statement is simply an outline of what he expects to prove in the case, and no proof in any sense of the word, and not to be taken as such against the defendant."

It is sometimes difficult, and often impossible for the representatives of the state to state in advance definitely what the testimony will be. At this stage of the proceedings the county attorney may not know whether all the witnesses for the state will be present, or whether he will be able to develop the case in strict accordance with his theory. There is always the possibility of newly discovered evidence during the course of the trial, and that the defendant may inject into the case some issue not anticipated. An opening statement is made to enable the jury to understand the issues before them, to more readily see the relation of the testimony introduced as affecting the issues presented. Subject to the control of the trial judge, the county attorney may state the facts which he expects to prove. At this stage it may be impossible for the trial judge to know whether certain purported facts are or will be admissible as evidence for the jury.

If the defendant requests it, or on his own motion, the court may at the close of the opening statement admonish the jury that the statements of the county attorney are not

to be considered as evidence in the case, but that the statement made by him is merely for the purpose of giving them a clear conception of the issues about to be tried. Boutcher v. State, 4 Okla. Cr. 576, 111 Pac. 1006; 26 R. C. L. 1031.

In this case, at the close of the opening statement of the county attorney, the jury were admonished by the court that the county attorney was not a witness in the case, and that his statements were not proof, in any sense of the word, and should be taken simply as an outline of what the state expected to prove. We have examined this opening statement in detail, and the various objections to the parts complained of, and, applying the rule above stated, we are of the opinion that these objections are without substantial merit, and that the overruling of them was not a prejudicial error.

In order to throw some further light on the attitude of the court and the attorneys for the defendant towards each other, extracts of the examination of witnesses are given below.

The first witness for the state was Mrs. Herzog, widow of the deceased. After referring to the day of the tragedy, the witness was asked:

"Well what happened that day? (Objection.) What did you notice about your husband's appearance that was unusual, if anything? (Objection.) State to the jury what you noticed about the condition of Tillman Jones, if anything, when he came up the road with your husband. (Objection.) Did you notice anything peculiar about his walk? (Objection.)"

After the witness had testified that she went to her husband after he was shot, she was asked these questions:

"Now state what was done on that occasion, and who was present. (Objection.) What was the condition of your husband when you saw him? (Objection. Withdrawn.) State in detail what you noticed. (Objection.) What was his condition? (Objection.) Did you see spot where the bullet pene-

trated his body? Yes, sir; after the operation. Describe that entrance to his body—where was it? (Objection.) How long did your husband, Paul Herzog, live? (Objection.)"

The next witness examined was Augusta Hoeckendorf. During the course of her examination these hostilities became acute. An extract from her testimony is as follows:

"By the Court: Q. Did he state anything to you with reference to his condition, as to whether— A. (interrupting). Yes, sir; he did.

"Q. Well, you may tell as to that.

"By Mr. Gleason: Objected to as incompetent, irrelevant, and immaterial. Objected to on the further ground that it calls for a conversation out of the presence of the defendant; and objected to on the further ground that it is hearsay.

"By the Court: It don't make any difference whether the defendant was present or not, that kind of declaration.

"By Mr. Gleason: Note our exception, and we except to the remarks of the court.

"By the Court: Q. If he stated anything with reference as to his condition—as to whether or not he realized his condition—you may state that.

"By Mr. Gleason: The same objection to that question.

"By the Court: Same ruling.

"By Mr. Gleason: Note our exception.

"By the Court: Go ahead.

"A. Well, I asked him how that came he was laying—

"By Mr. Gleason (interrupting): Now, if the court please, that is not answering the question.

"By the Court: I am going to let her go ahead anyway.

"By Mr. Gleason: Note our exception.

"A. Then he told me that Mr. Jones came to his place and got him, and he says,, 'Mr. Jones had two guns with him, and he was drunk,' and Mr. Jones wanted him —

"By the Court (interrupting): Mrs. Hoeckendorf, before going any further, I want you to tell me if he said anything with reference to his condition.

"By Mr. Gleason: If the court please, I would like permission—

"By the Court (interrupting): You are not going to talk while I am, young man—

"By Mr. Gleason (interrupting): Well—

"By the Court (interrupting): I will fine you $10. You are going to stop that shooting off your mouth while I am talking. You understand that I am trying to run this thing without your assistance, and while I am talking I want you to keep your mouth shut; do you understand? If you don't understand, you will do it before you try any more cases here in this courthouse.

"By Mr. Gleason: We except to the remarks of the court. Now, if the court please, or may I ask permission, or may I not have permission, to ask leave to strike out that portion of the witness' testimony in which she attempted to answer your question. May I have the permission—

"By the Court: You may do that at this time.

"By Mr. Gleason: I now move the court to strike out that portion of the witness' testimony in which she undertook to detail what Paul Herzog had stated to her as to the defendant going to his place on that day, and having two guns on his person, and being drunk, on the ground that it is not responsive to the question; on the further ground that it is hearsay, no proper foundation having been laid.

"By the Court: Q. Now, Mrs. Hoeckendorf—

"By Mr. Gleason: Will the court rule on that?

"By the Court: I will after a little. (Continuing:) Q. In this conversation you are talking about, did Mr. Herzog

say what his condition was? Did he say anything with refer-ence as to how he was getting along, or whether or not he realized? A. He said to me that he was shot, and that he was bleeding.

"Q. Well, did he say anything else?

"By Mr. Gleason: If the court please—

"A. (interrupting). And that he—

"By Mr. Gleason (interrupting and continuing): May I enter the same request?

"A. (continuing). That he didn't know whether he would get through—

"By the Court (interrupting): I will strike this if there is not—

"A. (interrupting and continuing). He said he was bleed-ing, and that he thought he wouldn't get through, and I told him then that he should tell his wife about things, that she would know how she was standing.

"By the Court: Q. He told you then that he was bleed-ing, and that he thought he wouldn't get well? A. Yes; and I told him that he should tell his wife, so that she would know the things and how she was standing."

This synopsis of portions of the record is given to show that there was more or less continued provocation on the part of the defendant's attorneys to irritate the court and call forth the disparaging remarks of which the defendant complains, leading up to the imposition of a fine or threatened fine of one of the defendant's attorneys for contempt of court. Whether or not the fine was actually imposed and paid does not appear from the record.

The situation here may be likened to incidents that some-time occur in our national sport of baseball, where it some-times happens that it will be to the advantage of one side or the other to make the umpire mad so as to excite him and disturb his mental poise.

A trial in a court of justice should not be permitted to degenerate into a contest of wits or skill between the court and the attorneys, or between the attorneys themselves. The court should be more than a mere umpire to sit and watch the contest. In the interests of justice, and for the full development of the facts, he has a right to interrogate witnesses, and generally to see that both sides have a fair and impartial hearing. While doing this the court should not do anything to humiliate any attorney in the discharge of his duty. Neither should any attorney in the case do anything to indicate that it is his purpose to irritate the court into the commission of error. McSpadden v. State, 8 Okla. Cr. 489, 129 Pac. 72; Miller v. Oklahoma, 149 Fed. 334, 79 C. C. A. 268, 9 Ann. Cas. 389; Thompson on Trials, § 355; Wigmore on Evidence, § 2484; Wharton on Evidence, p. 947.

After this the trial seems to have progressed with less friction. Fewer objections were interposed, and the defendant was given wide latitude in the cross-examination of witnesses and in the introduction of his own testimony. Throughout the course of this trial the court seems to have decided many doubtful questions in favor of the defendant. The court assumed no hostile attitude towards the defendant or his side of the case, but such hostile feeling as was manifested was directed towards his attorneys, and that the reason for such feeling was personal was probably considered by the jury; so that, under all the circumstances disclosed by this record, we hold that the rights of the defendant were not prejudicially affected by the remarks and conduct of the court.

We next notice the objections to the alleged prejudicial remarks of counsel for the state and the alleged incompetent testimony reflecting on the character of the defendant. The defendant went on the witness stand in his own defense, reciting facts tending to show that he took the life of the de-

ceased in his own necessary self-defense. Up to this time nothing relating to the character or reputation of the defendant had been developed in the evidence, until on cross-examination, over the objections of the defendant, the state was permitted to ask the following questions:

"Did yo uat any time pull a gun and threaten to shoot and pull a gun on him?"

"Is it not true that you were wearing a gun and belt at the Liberal fair?"

"Is it not true that you shot your wife?"

"Isn't it true that you shot and killed Lum Hickey?"

"Did you at any time pull a gun and threaten to shoot Tom McNorney?"

These questions were all answered by the defendant in the negative, and it was brought out that at this time the defendant's wife and Lum Hickey were living. No effort was made by the state to prove these charges.

It is not admissible to show the bad character of the defendant until after the defendant himself puts his good character in issue, and then only by showing his general reputation, and not by particular acts. Evidence of other criminal acts not in issue in the case should be excluded; such testimony has a tendency to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the charge at issue, or to take proof of it as justifying the defendant's condemnation, irrespective of his guilt of the crime for which he is being tried. Moreover, the use of alleged particular acts, ranging over the entire period of the defendant's life, makes it impossible for him to prepare to refute the charges, any or all of which may be mere fabrications. The rule as above stated has received the judicial

sanction of the courts of this country for more than a century. Underhill on Evidence, § 82; 1 Wigmore on Evidence, 233; 10 R. C. L. 953; Porter v. State, 8 Okla. Cr. 64, 126 Pac. 699; Corliss v. State, 12 Okla. Cr. 526, 159 Pac. 1015.

Applying this rule of the inadmissibilty of evidence as to offenses not in issue, the propounding to the defendant on cross-examination of the questions above quoted was error. It then becomes the duty of this court to determine whether, under all the circumstances in this case, this error was prejudicial.

This court has many times construed our statute of harmless error (section 6005, R. L. 1910) with reference to the admission of incompetent testimony. In a number of cases this court has held that the admission of testimony tending to show that the defendant was guilty of other specific offenses was prejudicial error. Watson v. State, 7 Okla. Cr. 590, 124 Pac. 1101; Rogers v. State, 8 Okla. Cr. 226, 127 Pac. 365; Reams v. State, 12 Okla. Cr. 363, 157 Pac. 273; Scott v. State, 13 Okla. Cr. 225, 163 Pac. 553; Byars v. State, 15 Okla. Cr. 308, 176 Pac. 253. On the other hand, in a number of cases this court has held that the propounding of such questions or the admission of such testimony was not prejudicial error. Byers v. Territory, 1 Okla. Cr. 698, 100 Pac. 261, 103 Pac. 532; White v. State, 4 Okla. Cr. 143, 111 Pac. 1010; Fulkerson v. State, 17 Okla. Cr. 103, 189 Pac. 1092.

The test of whether such testimony is prejudicial or not may be stated thus:

"Before this court can reverse a conviction upon the ground that the trial court erred in the admission or rejection of evidence, or in its instruction to the jury, we must further find, from an inspection of the entire record, that appellant was injured thereby; and to determine this issue

the court must consider the question as to whether the appellant is guilty * * * of the offense charged." Fowler v. State, 8 Okla. Cr. 130, 126 Pac. 831,

In order better to comprehend the scope and purpose of the harmless error statutes of this and other states, and the federal statute covering the same subject, it will be well to read the history of these enactments brought about by the American Bar Association, a portion of which appears in Byers v. Territory, supra.

In this case the testimony of the defendant himself, if believed by the jury, shows no justification for the homicide. On his testimony alone the jury would have been justified in rendering a verdict for murder, and upon examination of the whole record, applying the test above given, we hold that the error in permitting these improper questions to be propounded to defendant was not prejudicial, under all the circumstances in this case. We by no means approve of the conduct of the court and the prosecuting attorney in this regard, and, while we hold in this case that the asking of these improper questions did the defendant no harm, the admission of such testimony in subsequent cases might be prejudicial in the extreme, and be reversible error.

Third. The court arbitrarily instructed the jury that, in the event they found the defendant guilty of murder, they should fix his punishment at imprisonment for life in the state penitentiary. Section 2319, Revised Laws of Oklahoma 1910, provides as follows:

"Any person convicted of murder shall suffer death, or imprisonment at hard labor in the state penitentiary for life, at the discretion of the jury. Upon trial of an indictment for murder, the jury, if they find the defendant guilty, must designate in their verdict whether he shall be punished

by death or imprisonment for life, at hard labor, and the judgment of the court shall be in accordance therewith. But upon a plea of guilty the court shall determine the same."

The court, in a criminal case, has no right to assume the functions of legislation. If the jury should find the defendant guilty of murder, as they did in this case, it was for the jury, under the provisions of the statute above quoted, to fix the punishment at death or life imprisonment, at their discretion, and the court's instruction depriving them of this discretion, was error. But of this the defendant will not be heard to complain, since it operated to the advantage of the defendant, and was prejudicial only to the rights of the state. Hunter v. State, 6 Okla. Cr. 446, 119 Pac. 445; Carter v. State, 6 Okla. Cr. 232, 118 Pac. 264.

Fourth. There were 11 different witnesses who testified concerning the dying declarations of the deceased. This character of evidence came up at intervals all through the trial, without there having first been laid a proper predicate for its admission, in the absence of the jury. It would serve no good purpose to set out in detail the evidence offered, the numerous objections interposed, and the controversies and dialogues indulged in by the court and counsel.

The admissibility of such evidence is ordinarily a question of law for the court, and the court should require the necessary preliminary proof to be first made in the absence of the jury. If this rule had been adhered to in this case, it would have eliminated much of the controversy and friction that manifested itself from time to time between the court and counsel, as shown by this record. But, since the competency of such declarations, under our practice, is ultimately for the jury, and since the record in this case shows that there was ample evidence to justify the admission of these dying declar-

ations, the irregular manner of their admission, under the circumstances, was not prejudicial. Hawkins v. U. S., 3 Okla. Cr. 651, 108 Pac. 561; Morris v. State, 6 Okla. Cr. 29, 115 Pac. 1030; Elliott v. State, 18 Okla. Cr. 230, 194 Pac. 267; Beason v. State, 18 Okla. Cr. 388, 195 Pac. 792.

Defendant complains of the following instruction:

"You are further instructed that, while a person need not be in actual imminent peril of his life being taken, or of great personal injury being done to him, yet, if the jury believe that the defendant had reasonable grounds to believe, and did believe, from the facts as they reasonably appeared to him at the time, that the danger was so urgent and pressing or apparently so urgent and pressing that the defendant could not avoid taking such steps as he did to protect himself, then it was justifiable, and you should find the defendant not guilty."

It is contended that this instruction is erroneous, in that it required the jury to believe this state of facts before the defendant could be acquitted. We do not think that this instruction is susceptible of such interpretation, and the question of apparent danger and self-defense was sufficiently, if not correctly, stated. Ostendorf v. State, 8 Okla. Cr. 360, 128 Pac. 143; Johns v. State, 8 Okla. Cr. 585, 129 Pac. 451.

Sixth. Reverting again to the imposition of a fine, or threatened fine, for contempt upon one of the attorneys for the defendant in the presence of the jury, the record shows that one of the state's witnesses had testified that, after the effects of the surgical operation performed on the deceased had passed, to such an extent that he had regained consciousness, the deceased then told the witness how the tragedy came about. In the course of the many questions, interruptions, and objections, an attempt was made to have the witness state whether the deceased said anything indicat-

ing that he knew that his wounds were fatal, or that he did not expect to recover. The court interrupted the examination, as before quoted, culminating thus:

"By the Court (interrupting): I will fine you $10. You are going to stop that shooting off your mouth while I am talking. You understand I am trying to run this thing without your assistance, and while I am talking I want you to keep your mouth shut; do you understand? If you don't understand,, you will do it before you try any more cases here in this courthouse."

Further than this the record does not show whether a fine for contempt of court was in fact imposed or enforced. From all that preceded and all that followed this incident, as shown by this voluminous record, we are led to believe—and the jury must have believed—that the attorneys for the defendant made little effort to assist the court in conducting this trial in an orderly manner. The remarks of the court were unfortunate, but the attitude of the attorneys was in some measure responsible for this. The defendant and his attorneys cannot be heard to complain of matters brought on by their own wrong. If the rule were otherwise, any defendant in a criminal case would have it within his power to inject reversible error into his case, and so defeat the ends of justice. We hold, under all the circumstances in this case, that the conduct of the court complained of was not prejudicial.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.