# W. T. CRABTREE v. STATE.

No. A-3436—Opinion Filed Dec. 20, 1920.

(193 Pac. 1005.)

(Syllabus.)

1. **CRIMINAL LAW—Responsibility for Crime.** It may be stated, as a general proposition, that no one can be properly convicted of a crime that he did not commit, or to the commission of which he has never expressly or impliedly given his assent.

2. **HOMICIDE—Prejudicial Instruction on Conspiracy.** On a trial for murder under an information alleging that the defendant did strike the deceased "on the head with a dangerous and deadly weapon the name and character of which is unknown to the informant," the evidence showed that the homicide was the result of a drunken affray where each participant acted for himself, and there was no evidence tending to show a combination or conspiracy to assault and beat, or kill the deceased, and there was a direct conflict in the evidence as to whether the defendant or the principal witness for the state struck the fatal blow.

Held, that it was prejudicial error to instruct the jury on the law of criminal responsibility, where two or more persons combine or conspire together to commit any unlawful act, and that if the defendant or the witness Freeman or "one or both of them struck the deceased, and from which blow or blows the said deceased died, then each would be liable for the acts and conduct of the other and be held responsible for the death of the deceased," in that the instruction given by the court authorized the jury to convict, even though they believed the blow struck by the defendant did not cause the death of the deceased.

*Appeal from District Court, Tulsa County;*

*N. E. McNeill, Judge.*

W. T. Crabtree was convicted of manslaughter in the first degree, and he appeals. Reversed.

*Pat Malloy* and *E. M. Gallaher* (*Chas R. Bostick, M. A. Breckinridge,* and *Lee Daniel,* of counsel), for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

ARMSTRONG, J. The plaintiff in error, W. T. Crabtree, herein referred to as the defendant, was informed against for the murder of Chas. W. Shaw, and by verdict of a jury found guilty of manslaughter in the first degree, and his punishment fixed at 15 years' imprisonment in the penitentiary.

To reverse the judgment rendered on the verdict he prosecutes this appeal. The facts in the case briefly stated show that on the night of the 17th day of May, 1917, the deceased, Chas W. Shaw, the defendant, Crabtree, Fred Freeman, and others were at Mabel Brooks' roadhouse near Tulsa, indulging in the use of intoxicating liquors; that about midnight a difficulty arose between the deceased and Freeman, and the deceased drew his pistol upon Freeman and upon the defendant, Crabtree, and upon one or two other persons, and required each of them to hold up their hands; that during the affray Freeman picked up a loaded shotgun, and some one struck the deceased a blow on the head, causing almost instant death; that night the defendant and Fred Freeman took the body of the deceased in a Ford car from the scene of the homicide to a tank farm near Ramona and there dropped the body into an oil tank; three or four months later Fred Freeman was arrested at Hammond, Ind., and, on the promise of the officer who made the arrest that if he made a statement he would not be prosecuted, Freeman made a statement

and told where the body could be found. The following brief statement of the evidence will be sufficient to make clear the contentions made:

As a witness for the state, Fred Freeman testified:

"I was staying at Mabel Brooks' roadhouse. I met Charles W. Shaw that night at Russell's roadhouse. I drove there in a Ford with Bessie Shields. We had a few drinks together and then started to drive back to the other roadhouse. Another man named Tyler went with us. On the way I pulled out a six-shooter and shot all the cartridges out of it; and I said, 'We will go back to town and get some more shells.' Mr. Shaw said, 'I have a trunk full of them at home.' Then Miss Shields said, 'I will go on home afoot,' and she got out of the car. We went to Shaw's house and found the cartridges, but they would not fit my gun, so Mr. Shaw gave me his gun. We then went out to Mabel Brooks' roadhouse. Mrs. Brooks asked me why I made Bessie walk home, and we had an argument. I went into a bedroom and went to sleep. In about an hour Mr. Shaw came in, woke me, and said he wanted his gun. I got up. He poked it in my belly and told me to put my hands up. I put them up. The defendant, Crabtree, came in, and Mr. Shaw turned his gun on him and told him to put up his hands, or he would blow his damn brains out. Crabtree put up his hands and walked out on the back porch with Mr. Shaw behind him, and I picked up a loaded shotgun and walked out behind Mr. Shaw. I was trying to get Shaw in the notion of going home. The defendant Crabtree, came in and busted him over the head with a club. He went down, and we got some water and tried to bring him to. I had the shotgun in my hands when the defendant, Crabtree, struck Mr. Shaw, and I fired the shotgun. I don't know why I fired it. I was excited, crazy, and did not know what I was doing after he was murdered. I helped the defendant, Crabtree, put the body in the Ford car that I had been driving, and we drove up to Ramona

and put the body in one of the tanks on a tank farm near there."

For the defense, L. M. Payne testified:

"I was at the Mabel Brooks' roadhouse that night. Along between 11 and 12 Fred Freeman, a fellow called Tyler, and Mr. Shaw, the deceased, came in. Mabel Brooks said something to Freeman about making Bessie Shields walk back there and about a car. I never paid much attention to what they were saying. The next thing I saw Fred Freeman had a shotgun. Crabtree jumped up from the table and caught hold of the gun, saying, 'What are you trying to do Fred?' Freeman would not give up the gun. Then Mr. Shaw commenced jabbing me with a six-shooter and said, 'Get back in there and let them alone.' Crabtree and Freeman both had hold of the shotgun. Finally, they both walked back in the bedroom, and Mr. Shaw started in there and turned around at the door and said: 'You dirty son of a bitch! I am going to blow you in two. I have talked to you enough.' He cocked the gun, and said, 'I am going to kill you if you don't get back,' and I got back. The next thing I saw Crabtree was going through the dining room. He had his hands up, and Mr. Shaw was behind him with a pistol, and Freeman was right behind Shaw with a shotgun. They went on out through the kitchen. I saw Crabtree at the door. He had a piece of board in his hands. Then Freeman made a lick with the shotgun. I suppose he hit Mr. Shaw. I jumped back and a shot was fired. I went out. Crabtree was getting some water. Mr. Shaw was laying on the porch and Freeman standing over him. I said, 'It looks like you have killed him.' Freeman says: 'He ain't hurt. The son of a bitch is just stalling. I ought to stomp his damn brains out, coming out here and trying to mistreat my friends.' Shaw's gun was lying by his side. I picked it up and laid it on the shelf."

As a witness in his own behalf the defendant testified:

"My age is 46 years. I live east of the city with my

wife and children. I was at Mabel Brooks' roadhouse when Freeman, Tyler, and Shaw, the deceased, came there that night. It was the first time I ever met Mr. Shaw. I heard Shaw say he wanted his gun, and that Freeman had it; so I went in to the room where Freeman was and took the gun from Freeman and gave it to Shaw. Freeman and Shaw kept wrangling and fussing in there, and Shaw began to jab and point his pistol around at everybody. The next thing Shaw pointed the gun at me and told me to get up my hands. I did, and backed out. He followed me up, and Freeman was following Shaw with a shotgun. I backed into the kitchen and out on the back porch and through the door. Shaw was cussing and saying, 'Back up, you son of a bitch!' There was a stick sitting there against the window, that was used for a window prop. I picked it up and struck Shaw. It was a pine stick about an inch thick and about three feet long. Shaw was facing me when I hit him. I thought he was going to kill me. I could not get out. When I hit him, he staggered, and Fred Freeman hit him with the shotgun, and the gun went off. I went to the well and got some water and poured it on him and rubbed him. Whitey Payne took hold of his arm and felt of his pulse and said, 'I believe this man is dead.' Freeman said: 'He is just stalling. I ought to stomp his brains out.' I saw that he was dead, and said, 'We had better notify the sheriff.' Freeman says: 'Hell, that won't do! Let us put him in the car.' I said, 'All right.' He drove the car, and we went up through Vera and Ramona to that tank farm. Freeman said, 'One of these tanks will be a good place to put the body in,' and we took it from the car and dropped it in a tank. Freeman left the country. I didn't give him any money to go any place."

After a most careful reading of all the testimony in the case, we have been unable to find any evidence which tended even indirectly to support the theory of combination or conspiracy to assault, and beat, or kill the deceased. The uncontroverted facts are that the homicide was the

outcome of a drunken affray, where each participant acted for himself.

Among the instructions given by the court to which objections were made and exceptions saved were the following:

"No. 13. You are instructed that where several parties voluntarily act together in the commission of any act which may result in death to another, and such death ensues therefrom, all parties so acting together are as guilty of murder as if they had intended the death of such party.

"No. 14. You are instructed if you find and believe from the evidence, beyond a reasonable doubt, that the defendant and the witness Fred Freeman were acting together and in concert with each other, to effect a common purpose, and that one or both of them struck the deceased on the head, and from which blow or blows the said deceased died, then each would be liable for the acts and conduct of the other and be held responsible for the death of the said deceased."

"No. 23. You are instructed that all parties who, after the death and killing of the deceased, irrespective of whether the deceased was killed by the blow of Fred Freeman, if one was struck, or by the blow by the defendant, who concealed or aided persons engaged in the killing of the deceased, knowing the persons or parties who had killed said deceased, and with the intent that the party or parties responsible for said act might avoid or escape arrest, trial, conviction, or punishment, would be accessories after the fact of said crime, triable and punishable as such; but the jury are not to take that fact into consideration except for the purpose of determining the interest of said witnesses in said cause and the weight and value to be given to their testimony."

It may be stated, as a general proposition, that no one can be properly convicted of a crime to the commission

of which he has never expressly or impliedly given his assent. To hold otherwise would be contrary to natural right and shocking to every sense of justice and humanity.

However, under the familiar rule of criminal responsibility, in cases of conspiracy or combination, if the evidence prima facie established a combination or tended to show that the defendant Crabtree and the witness Freeman entered into a conspiracy to assault, beat, or kill the deceased, the acts and declarations of each of the confederates, done or made in furtherance of the common design, were the acts and declarations of both, then and in that event the giving of instructions numbered 13 and 14 would be proper. The rule of criminal responsibility for the acts of others is subject to the reasonable limitation that the particular act of one of a party for which his associates and confederates are to be held liable, must be shown to have been done in furtherance of the common object and design for which they combined together. The record shows that Freeman, upon whose testimony the prosecution mainly rests, testified that there was no common purpose or design to assault and strike, or kill the deceased, and there is no evidence in the case tending to show that the defendant Crabtree and the witness Freeman conspired or agreed to assault and beat, or to kill the deceased, and, there being a direct conflict of evidence as to whether the blow struck by the defendant, Crabtree, with a club, caused the homicide, or whether the deceased came to his death by reason of a blow struck by Freeman with a shotgun, the giving of instructions numbered 13 and 14 was prejudicial to the substantial rights of the defendant, in that said instructions authorized the jury to convict the defendant, even though they believed that

the blow struck by him did not cause the death of the deceased, and that the homicide was caused by a blow struck by Freeman.

It follows that under the evidence in this case it would be manifestly unjust to hold the defendant liable for an act done by another which he had never either expressly or impliedly assented or agreed to.

In *Wilcox et al. v. U. S.*, 7 Ind. T. 86, 103 S. W. 774, it is said:

"The gist of a conspiracy is planning and agreeing to commit the offense prohibited. * * * To make out a case of conspiracy, it is necessary to prove that defendants agreed either expressly or impliedly to commit some one or more of the things prohibited * * * and in consummation thereof did some overt act."

It is elementary that the giving of instructions upon a material issue in the case, not applicable to the evidence, is prejudicial error.

"A charge which asserts correctly an abstract principle of law, but is not applicable to the evidence or which is based upon the assumption of the evidence of material facts of which there is no evidence, should not be given." 12 Cyc., p. 651, § 27, and the many citations from nearly every state in the Union supporting said text.

While instruction No. 23 correctly defines an accessory after the fact, we think said instruction as a whole was misleading and may have created upon the mind of the jury the impression that the removal and concealment of the body was sufficient to convict defendant of the homicide charged, and this vice of the instruction we do not think was cured by confining their consideration of such evidence for the purpose of determining the interest

of the said witnesses in this case, and the weight and value to be given to their testimony, and that such instruction was not a clear and affirmative instruction, and hence prejudicial error.

"It is error for the trial court to single out a defendant and charge upon the weight of his testimony." *Brown v. State,* 9 Okla. Cr. 382, 132 Pac. 359.

"The instructions of the * * * court should apply the law to the competent evidence as offered by the state and the accused, and leave the jury to determine as to what facts and circumstances are established by the evidence." *Dooling v. State,* 3 Okla. Cr. 491, 106 Pac. 982.

In *Brock v. State,* 6 Okla. Cr. 23, 115 Pac. 1026, it is said:

"The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury has been properly instructed as to the law of the case."

Inasmuch as the errors pointed out must reverse the judgment of conviction rendered, we deem it unnecessary to consider any of the other errors assigned.

For the reasons stated, the judgment of the trial court is reversed, and a new trial awarded.

DOYLE, P. J., and MATSON, J., concur.