**Doyle TURNER, Plaintiff in Error,**

v.

**The STATE of Oklahoma, Defendant in Error.**

**No. A–15074.**

Court of Criminal Appeals of Oklahoma.

Nov. 10, 1970.

Larry B. Lucas, Poteau, Court-appointed, for plaintiff in error.

G. T. Blankenship, Atty. Gen., John C. Howard, Asst. Atty. Gen., for defendant in error.

NIX, Judge:

Doyle Turner, who shall be referred to as the defendant, was charged by information with the crime of Murder in the District Court of LeFlore County. He was tried before a jury, who found him guilty, and assessed his punishment at Life in the penitentiary. From that judgment and sentence the defendant appeals to this Court asserting numerous assignments of error, the most important alleged error being that

the evidence is not sufficient to support the verdict of the jury in that the corpus delicti was never established. Before an adequate discussion of the law is made, it is necessary to briefly relate the facts as revealed by a review of the testimony. An accurate outline of the testimony in substance is to be found in defendant's brief, related as follows:

The murder with which this prosecution was concerned occurred on or about December 3, 1966, on a country road approximately two miles South of Talihina, Oklahoma, as a result of a beating inflicted on the victim, John Elder. The testimony of the State's witnesses, established the following to be in substance what occurred: Pauline Hickman testified that on the night of December 3, 1966, she closed a bar where she was a waitress, known as Pete's Place at approximately 11:00 p. m. She asked the victim, John Elder, to take her to another bar known as Repete's Place, located East of Talihina for the purpose of turning over the money for the week's work. On arriving in Elder's car, the couple were approached by the defendant who told Elder that co-defendant Ernest Moore wanted to see him in back of the building. Miss Hickman further stated Elder refused to go and that a Billy Morgan then approached the group and told the victim he was still mad at him for having been whipped by him earlier in the week. The co-defendant Moore then approached the group, took the victim by the arm and the four men walked toward the back of the building. She further testified that after she had turned the receipts over to her employer, she returned outside but was unable to locate the victim or the defendant Turner or the two other men but saw Elder's car still parked in front of the tavern. At approximately 12:30 a. m., Miss Hickman stated the defendant returned to the tavern looking for a siphoning hose and on being questioned by her, denied having seen the victim all day. Miss Hickman testified the defendant returned a second time at approximately 1:50 a. m. to pick up co-defendant Moore's wife and they then

left. She stated she then contacted law enforcement personnel and informed them as to the victim's disappearance.

Through the testimony of Sue and Ernest Victor Rogers, the State presented evidence that on December 3, 1966, the couple were on the way home around 11:30 p. m., when they came onto a pickup truck blocking the county road. Mrs. Rogers testified that the defendant got into the pickup and drove it over to the side of the road while two other men, holding the arms of the victim, moved him out of the way so the couple could pass by. Mrs. Rogers further testified that the left side of the victim's face and his arm were bloodied. Mr. Rogers reiterated the same testimony as his wife gave and further stated that he clearly recognized the victim as being John Elder.

The State next read into the record the testimony of Burman Karr given at the defendant's preliminary hearing. Mr. Karr was unable to be present at the defendant's trial as a result of a heart attack. It was Karr's testimony that on December 9th, 1966, he and a Joe Bryant were repairing a fence when they discovered a coat lying beside the fence which contained a letter addressed to John Elder. Mr. Karr then turned the coat and letter over to Talihina Police Chief Clyde Slaughter.

It was Officer Slaughter's testimony that he picked up the coat and letter which were found approximately three miles South of Talihina in LeFlore County and further that he turned the coat over to the State Bureau of Investigation Agent, Lile Smith.

Betty Wren next testified, and in substance stated that her husband and two children were returning home from a late movie when they passed the pickup truck previously identified by Mr. and Mrs. Rogers parked on the side of the road around 1:15 a. m. on the morning of December 4, 1966.

The next two witnesses to testify on behalf of the State were Delton Smith and Melvin Moody. Both men substantially testified to the same facts. It was their testimony that they were involved in a

search for the victim in the Potato Hills area near the co-defendant Moore's home on February 16, 1967, and that they discovered what was later identified as the "torso" section of a human body in a shallow grave as shown in State's Exhibits 3 and 4 [cm 376–377].

Elzie Shockely next testified that he had loaned the pickup truck which the defendant was seen driving, to the co-defendant Moore. Mr. Shockley stated that when the pickup was returned in the middle of December, 1966, he and a deputy sheriff examined it at which time he noticed that some five pieces of the seat cover had been cut out and that there were dark stains on the dash, seat, and floorboard.

Oklahoma Bureau of Investigation Agent Lile Smith next testified that on December 4, 1966, he was given a missing person's report on the victim, and that on December 5, 1966, he and other law enforcement personnel went to the residence of the co-defendant Moore and the defendant to talk to them about the victim. He further stated that on January 18, 1967, he found a shallow grave containing pieces of clothing found near the defendant's residence which were later identified as belonging to the victim and on February 15, 1967, found and photographed a leg from the knee down, intact with foot, boot, and sock.

The next witness to testify was Talihina shoe store owner, Leon Cranford. Mr. Cranford testified that in November, 1966, he sold a pair of Wellington boots to the victim and that the Wellington boot brought to him by Agent Smith contained the same stock number as the style he carried in his store.

The victim's mother, Mrs. Lottie Elder, next testified and identified the boot, coat, and articles of clothing found as those being worn by her son the last time she saw him.

Deputy Sheriff Ora Dill then testified that on December 4th, 1966, he drove out to Repete's Tavern after receiving the missing persons report. He noted the victim's car was parked there around 2:00 a. m., but that on his return around 5:00 a. m., it was gone and that it was later found at the defendant's residence. Mr. Dill further stated when he talked to the defendant on December 5, 1966, about the victim being missing, he became nervous and started whittling and told him he had not seen the victim since December 3, 1966, at Repete's Tavern when he crawled into a car and went to sleep while the co-defendants Moore and Morgan were talking to the victim.

State Bureau of Investigation Chemist Bryan Tipton next testified he had examined scrapings taken from various places on the pickup and the victim's coat and determined they were "O" type blood.

The State's evidence of what occurred on December 4, 1966, and the ensuing days was corroborated by co-defendant Billy Morgan who was given immunity from prosecution in exchange for his testimony. His testimony reflected that he and the defendant and Moore took the victim from Repete's Tavern in the borrowed pickup several miles outside of Talihina on a county road located somewhere in Latimer County. Further, that he and the victim had a short scuffle when the co-defendant Moore stepped in and struck the victim several times, knocking him down three times, until he had to stop because of an approaching vehicle. The four men then got back into the pickup and started returning to the tavern when the pickup stalled. Mr. Morgan stated that the victim attempted to run away and was chased down and brought back to the pickup by the defendant and co-defendant Moore. He testified he and the defendant left to look for some gasoline—at that time John Elder was alive—and that on their return the co-defendant Moore told them the victim was dead. The defendant then helped to get the victim back into the pickup, and he was taken to the defendant's residence. The defendant and Moore then returned to the tavern and brought back the victim's car. After spending the night, Morgan testified that he left the next day and during the interim to January 5, 1967, traveled to

various cities in the State and Colorado. Morgan concluded he never saw the victim again after the night of December 3, 1966.

Oklahoma Highway Patrolman Charles Cates next testified and identified certain articles of clothing as being those found in a shallow grave located some 300 yards from the defendant's residence. Patrolman Cates further stated that near the grave site he found a great amount of whittlings which looked like someone had been whittling there for a considerable amount of time.

Bill Rockwell, LeFlore County Court Clerk, testified as to the court order granting Billy Morgan immunity from prosecution and the verdict of the jury in the case against Ernest Moore finding him not guilty.

It is to be observed that originally all three men involved in this affair were charged with murder—Ernest Moore, Billy Morgan, and Doyle Turner. Ernest Moore was tried before a jury and was acquitted; Billy Morgan was granted immunity from prosecution in exchange for his testimony; and, as is reflected by this appeal, Doyle Turner was convicted and given life imprisonment.

 In the case at bar, the State bases their alleged crime upon the theory that defendant was a party to the crime by virtue of aiding and abetting in its commission. However, your reader has thoroughly reviewed the record and fails to find where competent testimony shows this defendant reflected any animosity or actions toward the deceased, or did anything indicating an intention to kill or murder anybody, or even to do bodily harm. And, the evidence from the State's own eyewitness was that defendant did nothing to encourage, aid, or abet, or assist the co-defendant at the time of the actual killing. Billy Morgan, the State's chief witness testified at great length and his testimony fails to reveal a conspiracy or fails to show any actions on the part of the defendant that would justify a conviction for homicide.

When all parties met at Repete's Tavern the evening of the alleged crime, Morgan testified that the following happened:

"Q. Now you state that Ernie Moore came out and got Mr. Elder by the arm and took him towards the rear of the building, is that correct?

A. Yes, sir.

Q. Now, what did you think you were going to do, when you—did you have any plan, or anything in mind, when you got back to the end of the building?

A. No, sir, we didn't have no plan, no,—

Q. What did you think you were going to do?

A. (continuing)—sir.

Q. Well, did you have any idea what you were going to do, back at the back of the building?

A. I thought we was going to take a drink of whiskey.

Q. All right, sir. And for that reason, you went back there, is that correct?

A. Yes, sir.

Q. And when you got back there, you say Mr. Moore already had Mr. Elder in the truck, or they were both in the truck, when you got back there?

A. Yes, sir. They was both in the truck.

Q. Then you and Mr. Turner got in the truck, along with them?

A. Yes, sir.

Q. Did you still think you might—somebody might have a drink of whiskey?

A. Yes, sir.

Q. And who drove the truck away?

A. Ernest Moore."

While the parties were enroute to the crime scene, Morgan testified as to the following:

"Q. And then what happened, when you were driving down the road?

A. Well, Ernest and John was—discussing—this loan.

Q. They were talking about a loan?

A. From what I could understand, they was.

Q. Now, did Mr. Doyle Turner ever make any statement to Mr. Elder, at all, during this time?

A. None that I know of.

Q. You were sitting in the truck, weren't you?

A. Yes, sir.

Q. All right. And you and he, actually, were riding along as passengers?

A. Yes, sir, we was along.

Q. And then the truck stopped, or—did somebody stop it, do you know?

A. No, Ernest—he just stopped the truck.

Q. He stopped the truck. And the first conversation that was had, when the truck stopped—what was it?

A. That's when I told John that I didn't like the way he did, a few nights before.

Q. Had you told anybody that that's what you were going to do, when you got out there?

A. No sir, Not that I know of.

Q. Did you have that in mind, when you started out there?

A. No, sir.

Q. And you stated, then, that you and Mr. Elder got out of the truck and got in front of the truck, and got in a scuffle.

A. Yes, sir.

Q. Mr. Followell had you to describe the scuffle. And then you fell in a ditch.

A. Yes, sir.

Q. Did you hurt yourself, at all, when you fell in the ditch?

A. No, sir.

Q. And Mr. Elder got up out of the ditch. You don't know whether he was hurt or not, at that time, do you?

A. No, sir, he got up. We both got up about the same time.

Q. Okay. And then, did he get up out of the ditch and Mr. Moore come over to him, or did he get up and go over to Mr. Moore?

A. He got up, and we was walking out of the ditch.

Q. Where was Doyle Turner all this time?

A. He was standing out in front of the—the truck, too.

Q. Did he say anything, while all this was going on?

A. Ah—no, sir.

Q. All right, sir. And that's when Mr. Moore hit and knocked down Mr. John Elder, three times? Is that correct?

A. Yes, sir.

Q. And then a truck came along, as soon as that happened, and Mr. Doyle Turner—the only thing he did, was to move the truck so that these people could get by? Is that correct?

A. Yes. Yes, sir.

Q. And you and Mr. Ernest Moore lifted this man up, onto his feet, up out of the road, is that correct?

A. Yes, sir.

Q. Then, was the fight over?

A. Yes, sir. We—we got back in the —we all got back in the pickup, then.

Q. And where were you going?

A. Back to town.

Q. Back to town? Or were you going back to the beer tavern?

A. Well, back to the beer tavern.

Q. All right. In other words, the fight is over, and everything is satisfied, and you are going back to Repete's, to this beer tavern?

A. Yes, sir."

After the parties had started back to Repete's Place, the pickup in which they were riding ran out of gas. Mr. Morgan testified the following transpired:

"Q. All right. And then, unfortunately, the car stalled, is that correct?

A. Yes, sir.

Q. And you state that Mr. Elder and Mr. Moore and Mr. Turner got out of the truck and went around in front and were working on the truck, is that correct?

A. Yes, sir.

Q. And Mr.—did Mr. Moore, or did Mr. Turner or Mr. Elder have any words, at that time?

A. Ah—not that I know of.

Q. All right. And was Mr. Elder helping, trying to fix the truck?

A. Ah—Yes, sir. They was all three working on it.

Q. And the, the next time you knew anything about it—you worked on the truck for how long?

A. Oh, they were—they worked on it for about five or ten minutes. Something like that.

Q. And the next time that you knew anything might be going on, was when Ernie Moore came up and told you something, isn't that right?

A. Yes, sir, he come up and said John had went back down the road—

Q. (interrupting) Well, don't tell me what he said, now, unless Doyle was present, and then it's all right. But he said something, is that correct?

A. Yes, sir.

Q. Did you see John Elder go up the road?

A. I didn't see him go up the road, no, sir.

Q. Did you see John Elder—or, Doyle Turner, go up the road?

A. No, sir.

Q. When was the first time you saw them, after that?

A. When they was coming back.

Q. They was coming back.

A. Yes, sir.

Q. Was John Elder walking?

A. Ah—he was in between Doyle and Ernest.

Q. Well, was he walking?

A. Yes, he was walking, but they had ahold of his arms.

Q. They had ahold of his arms. Helping him?

A. I would say they just had ahold of his arms.

Q. You would say they had ahold of his arms. All right. Did you see any bruises, or any marks, or anything, when you left there to go get gas, other than what had been inflicted upon him by Ernest Moore, out in front of that pickup truck.

A. I just seen blood on his face, was all.

Q. And the blood was on his face—

A. On his nose, mostly. And face.

Q. The blood was on his face after the beating out in front of the pickup, wasn't it?

A. It was on there, yes.

Q. And he was—was he alive at the time you left, to go back to town to get gas?

A. Yes, sir.

Q. Now I will ask you—and I am not trying to confuse you, Billy, but about getting back in the pickup—did he get back in the pickup by himself? John Elder?

A. Well,—ah—when they come up there, why him and Ernie just got into the pickup. I don't know whether he got in, himself, or Ernie was holding his arm, or what. But when they come up why the pickup door was open, and they just got right on into the pickup, and Doyle and I went on for the gas."

At this point, Doyle Turner and Billy Morgan left on foot to get some gas. They walked to town, got a siphoning hose and then some gas, and returned to the pickup. Upon their return the following transpired, according to the testimony of State's witness, Billy Morgan:

"Q. All right. What happened after you arrived back at the pickup truck?

A. Well, we got back out there, why —Ernest Moore and John wasn't in the truck, then.

Q. All right, sir. And then what happened?

A. Ah—Ernest come to the—fence, and—he said John was dead.

Q. By 'John' who did he mean?

A. John Elders.

Q. All right, now where was this fence located?

A. It was located right beside the—the road, there.

Q. This would be near which door of the pickup truck?

A. The right side door.

Q. All right, sir. And then what happened after Ernest Moore told you this?

A. Well, he told Doyle to come over there and help him load—

\* \* \* \* \* \*

Q. What happened when Ernest Moore asked Doyle Turner to do something?

A. He told Doyle to come over there and—and load John up in the pickup.

Q. All right, sir. Did you see John Elder's body?

A. Yes, sir.

Q. Where was it?

A. It was across the fence.

Q. Do you know how far across the fence it was?

A. No sir.

Q. All right. And then what happened?

A. Well, they—ah—Ernest pulled him over to the fence, and then him and Doyle loaded him in the pickup."

The defendant, at Ernest Moore's request, then proceeded back to Repete's and picked up Moore's wife and took her home while Billy Morgan and Ernest Moore, along with the body of John Elder, proceeded to Moore's home.

The rationale of law that governs in such cases was well stated in a very early case, Hubbard v. State, 71 Okl.Cr. 373, 112 P.2d 174:

"Okla.St.Ann., title 21, section 172, provides: 'All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals.' Under the above statute, to be concerned in the commission of crime as a principal, one must either commit the crime himself, or procure it to be done, or aid or assist, abet, advise, or encourage its commission. A mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime."

Also, in Moore v. State, 4 Okl.Cr. 212, 111 P. 822:

"To constitute one a party to a crime under this statute, it is necessary that such person be concerned in the commission of the offense—that is, that he either commit it or aid or abet its commission—and it is not sufficient that he merely acquiese therein. Consenting and acquiescing are mere mental acts which, unless communicated to the perpetrator of the offense, in no manner aid or abet him in its perpetration. To be concerned in the commission of crime, one must either commit the crime himself, or procure it to be done, or aid or assist, abet, advise, or encourage its commission. But a mere mental assent to or acquiescence in the commission of a crime by one who did not procure or advise its perpetration, who takes no part therein, gives no counsel and utters no word of encouragement to the perpetrator, however wrong morally, does not in law constitute such person a participant in the crime."

Also, see: Anglin v. State, 92 Okl.Cr. 430, 224 P.2d 272 (1950); Moulton v. State, 88 Okl.Cr. 184, 201 P.2d 268 (1948).

An earlier case to the same effect is Polk v. State, 26 Okl.Cr. 283, 224 P. 194, 206:

"It may be stated as a general proposition that no one can be properly convicted of a crime to the commission of which he has never expressly or impliedly given his assent. To hold otherwise would be contrary to natural right and shocking to every sense of justice and humanity. When the accused is present and aiding and abetting another in its commission he may be considered as expressly assenting thereto, so, where he has entered into a conspiracy with others to commit a felony or other crime under such circumstances as will, when tested by experience, probably result in the unlawful taking of human life, he must be presumed to have understood the consequences. * * *"

Other cases involving the issues here involved are: Scott v. State, 13 Okl.Cr. 225, 163 P. 553; Holmes v. State, 6 Okl. Cr. 541, 119 P. 430, 120 P. 300; Crabtree v. State, 18 Okl.Cr. 125, 193 P. 1005; Thompson v. State, 14 Okl.Cr. 209, 169 P. 1125; Carrico v. State, 16 Okl.Cr. 118, 180 P. 870; Vann v. State, 21 Okl.Cr. 298, 207 P. 102; Weatherholt v. State, 9 Okl.Cr. 161, 131 P. 185.

The State's only eye witness and the only one to testify as to what happened stated as follows:

"Q. He stopped the truck, and the first conversation that was had, when the truck stopped—what was it?

A. Thats when I told John that I didn't like the way he did, a few nights before.

Q. Had you told anybody that thats what you were going to do, when you got there?

A. No, sir. Not that I know of.

Q. Did you have that in mind when you started out there?

A. No, sir."

In a late Federal case, United States v. Turnipseed, 7 Cir., 272 F.2d 106, syllabus 2, the court said:

"In order to aid and abet the commission of a crime, it is necessary that the supposed aider and abettor act with knowledge that an offense is to be committed."

Nye & Nissen v. United States, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Mays v. United States, C.A. 8, 261 F.2d 662; United States v. Moses, C.A. 3, 220 F.2d 166; United States v. Alexander, C.A. 7, 219 F. 2d 225; United States v. Anthony, D.C. Pa., 145 F.Supp. 323; People v. Cooper, 326 Mich. 514, 40 N.W.2d 708, opinion adhered to 328 Mich. 159, 43 N.W.2d 310; Spradlin v. Commonwealth, 195 Va. 523, 79 S.E.2d 443; Morei v. United States, C.C.A. 6, 127 F.2d 827; State v. O'Donnell, 8 N.J.Super. 13, 73 A.2d 207; People v. Le Grant, 76 Cal.App.2d 148, 172 P.2d 554.

This case is absolutely void of any testimony which would justify the conviction of this defendant as a principal under the law. There is no proof of a conspiracy or pre-arranged plan between defendant and either of the co-defendants to murder, or kill, or even do bodily harm to any person. No words spoken or moves made to indicate malice, or intention to harm, and above all —no participation by this defendant in any way to aid or abet or even assist either of the co-defendants in their action.

It is a tragedy that a life was allegedly taken in such a manner and no one suffer the penalty usually extracted, but a careful review of all the testimony just does not justify a guilty verdict of murder against this defendant. According to the record, this defendant played no part in the related affair except being present. The other two co-defendants did have action with deceased, but they went "scott free"—one by a jury, and the other as a result of being granted immunity in exchange for his testimony.

This Court does not believe the State proved a case of murder against defendant, and the trial court should have sustained the demurrer and instructed the jury to return a verdict of not guilty.

Therefore, it is the order of this Court that said case be reversed and remanded back to the trial court, and unless additional evidence be obtained to connect defendant to the crime, the cause should be dismissed.

Reversed and remanded with instructions.

BRETT, P. J., and BUSSEY, J., concur.